**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellant,*

v.

DARRELL DOMINIQUE PULLIAM,
            *Defendant-Appellee.*

No. 03-50550

D.C. No.
CR-03-00710-TJH

OPINION

Appeal from the United States District Court
for the Central District of California
Terry J. Hatter, Chief District Judge, Presiding

Argued and Submitted
October 8, 2004—Pasadena, California

Filed April 21, 2005

Before: J. Clifford Wallace, Thomas G. Nelson, and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Wallace;
Dissent by Judge Wardlaw

**COUNSEL**

Fred A. Rowley, Jr., Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellant.

Elizabeth A. Newman, Deputy Federal Public Defender, Los Angeles, California, for the defendant-appellee.

**OPINION**

WALLACE, Senior Circuit Judge:

Following a lawful traffic stop of a car in which Defendant-Appellee Pulliam was a passenger, the police illegally detained him and the car's driver, and illegally searched the car. The search produced a gun, and Pulliam was charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

The government appeals from the district court's order suppressing the gun. The district court had jurisdiction pursuant to 18 U.S.C. § 3231, and we have jurisdiction pursuant to 18 U.S.C. § 3731. Because Pulliam lacks standing to object to the vehicle search, and the gun's discovery was not the product of Pulliam's unlawful detention, the gun should not have been suppressed. We therefore reverse and remand.

I.

Officers Algren and Sambrano, both members of the Los Angeles Police Department Gang Enforcement Division, were patrolling in their vehicle through part of the city known for gang activity. Gang crime was expected because it was "Rollin' 60's day," the birthday of the Rollin' 60's gang which operates in that area.

The officers stopped in front of a building Algren knew to be a gang hangout, because he had responded to calls there and had seen other officers find firearms and drugs in the building. When the officers looked through the front gate into the courtyard, they saw Donte Richards and Pulliam. Algren recognized Richards as a member of the Rollin' 60's gang and knew him to be a parolee. Neither officer recognized Pulliam. Richards and Pulliam looked "surprised" when they saw the officers and began to speak with one another in a "furtive" fashion. Sambrano thought it clear that Richards and Pulliam had intended to walk out of the courtyard but reconsidered when they saw the officers.

Richards then walked over to the police car and spoke with Algren, while Pulliam stayed in the courtyard. Algren believed this conversation was intended to distract the officers and "suspected that [Pulliam] was a wanted suspect or was armed." The officers drove away when the conversation ended, but quickly positioned themselves to be able to follow the two men. Sambrano thought Richards and Pulliam would likely leave the apartment building in a grey Dodge Stratus car parked nearby. Sambrano concedes that the officers had already decided that they were "going to follow them" and "find a reason to stop them."

A few moments later, the officers saw the car drive by with Richards driving. After following for two blocks, the officers noticed that the car's left rear brake light did not operate when the car slowed. They also assert that the car rolled through a

stop sign. Algren and Sambrano then decided to stop the car, and activated the patrol car's siren and lights. Richards did not immediately respond. He continued driving for approximately 45 seconds covering 150 yards, even though there was room for him to pull over to the curb (a point that Richards disputed). This allegedly caused Algren's suspicion to increase; he feared that Richards and Pulliam would flee either in the car or on foot, or would have a violent altercation with the officers.

When the car stopped, the officers got out of their car with their weapons aimed low. Richards and Pulliam were ordered out of the car and to walk to the curb, where they were handcuffed and patted down. Algren then went directly to the car, looked under the passenger seat and found a gun. The officers found no weapons or other contraband on Pulliam during the earlier patdown, and did not question either of the men in the brief period before the gun was found.

Pulliam later admitted to owning the gun, and gave written and audio-taped statements about the offense. He was charged with being a felon in possession of a firearm. Pulliam then filed a motion to suppress the gun and his incriminating statements. In opposition to the motion, the government argued, among other things, that Pulliam, as a mere passenger in the car, had standing to challenge the stop of the vehicle but not the search itself; that the car was lawfully stopped on the basis of the various alleged traffic violations; that the gun was not the "fruit" of Pulliam's detention following the stop; that the officers had reasonable suspicion to detain Pulliam because they suspected that he posed a danger to them; and that the gun inevitably would have been discovered during a lawful parole search of Richards.

The district court held a suppression hearing at which Algren, Sambrano, Richards, and Richards' sister, Monique Robinson, testified. Richards had earlier stated in a declaration that Robinson owns the car and that Pulliam does not

drive or have keys to it. At the hearing, Robinson also said Pulliam has no ownership interest in the car and never borrows it from her. Pulliam's counsel elicited testimony from Robinson suggesting that the brake light was working and that the officers might themselves have broken it to manufacture a reason for stopping the car.

The district court also asked Sambrano about the officers' purpose for each step in their encounter with Pulliam. Sambrano explained that they stopped the car because of the traffic violations; ordered Richards and Pulliam out of the car and patted them down for safety concerns; and detained Richards and Pulliam in order to identify them. The court asked, "You effected a traffic stop. What purpose did you have in identifying the passengers?" Sambrano responded:

> The purpose is being that working the gang unit — that one of our ultimate goals to identify persons who either are affiliates or associates with known gang members. And that goes into part with our intelligence to identify the car, the vehicle, that gang members are driving, who they are hanging out with, or who's hanging out with them.

After hearing arguments from counsel, the district court granted the suppression motion. The court focused on whether there was reasonable suspicion for the stop, found that the taillight was not working, and concluded that this provided authority for stopping the car. But it held that the officers had no reasonable basis for going further, and that the car search was invalid. It also stated that there was no reason to get to the inevitable discovery doctrine.

## II.

On appeal, the government concedes that the officers lacked authority either to detain Pulliam or to search the car, and it does not presently challenge the district court's ruling

suppressing Pulliam's statements. In addition, Pulliam does not contest the district court's ruling that the initial stop of the car was lawful, given the malfunctioning taillight. Nor does he specifically challenge being ordered out of the car. Pulliam contends that the district court properly suppressed the gun as the fruit of a constitutional violation.

### A.

We review de novo the district court's suppression order and its implicit legal conclusion that Pulliam had standing to seek suppression of the gun; the underlying factual findings are reviewed for clear error. *See United States v. Bynum*, 362 F.3d 574, 578 (9th Cir. 2004) (motion to suppress); *United States v. Sarkisian*, 197 F.3d 966, 986 (9th Cir. 1999) (standing).

"[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.' " *Segura v. United States*, 468 U.S. 796, 804 (1984) (citations omitted). "It 'extends as well to the indirect as the direct products' of unconstitutional conduct." *Id.*, *quoting Wong Sun v. United States*, 371 U.S. 471, 484 (1963). In this case, we must apply two well-established principles that limit the reach of the exclusionary rule.

**[1]** The first is that "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas v. Illinois*, 439 U.S. 128, 134 (1978). Thus, a person seeking to exclude evidence allegedly obtained in violation of the fourth amendment must have standing to challenge the illegal conduct that led to the discovery of the evidence. "[T]o say that a party lacks fourth amendment standing is to say that *his* reasonable expectation

of privacy has not been infringed. It is with this understanding that we use 'standing' as a shorthand term." *United States v. Taketa*, 923 F.2d 665, 669-70 (9th Cir. 1991) (citation omitted).

**[2]** The second principle is that suppression is not justified unless the evidence is " 'in some sense the product of illegal governmental activity.' " *Segura*, 468 U.S. at 815, *quoting United States v. Crews*, 445 U.S. 463, 471 (1980). Pursuant to this basic principle of causation, "evidence will not be excluded as 'fruit' unless the illegality is at least the 'but for' cause of the discovery of the evidence." *Id.*

**[3]** Applying these principles to this case, we must first determine which of the officers' actions Pulliam has standing to challenge. As a passenger with no possessory interest in the car Richards was driving, Pulliam " 'has no reasonable expectation of privacy in a car that would permit [his] Fourth Amendment challenge to a search of the car.' " *United States v. Twilley*, 222 F.3d 1092, 1095 (9th Cir. 2000) (alteration in original), *quoting United States v. Eylicio-Montoya*, 70 F.3d 1158, 1162 (10th Cir. 1995). Furthermore, Pulliam "made no showing that [he] had any legitimate expectation of privacy in the . . . area under the seat of the car in which [he was] merely [a] passenger[ ]," as this is an "area[ ] in which a passenger *qua* passenger simply would not normally have a legitimate expectation of privacy." *Rakas*, 439 U.S. at 148-49. Similarly, the mere fact that Pulliam "claimed ownership" of the gun does not confer standing upon him to seek its suppression. *Rawlings v. Kentucky*, 448 U.S. 98, 105 (1980).

In addition, Pulliam does not argue that the detention of the car after the stop constituted a de facto seizure of his person. That is, he does not contend that even if the officers had permitted him to leave, he nonetheless could not reasonably have been expected to do so because the officers continued to detain the car. *Cf. United States v. Dortch*, 199 F.3d 193, 197 n.4 (5th Cir. 1999) ("Dortch's complaint is not that the *vehicle*

was detained or improperly searched, but rather that *he* was improperly seized in that, under the circumstances, he would not feel free to leave without his vehicle . . . and because he could not reasonably be expected to wander off down the highway in an unfamiliar area"). We therefore need not decide whether such an argument might have enabled Pulliam to challenge the evidence derived from the car's illegal detention.[1]

**[4]** But, Pulliam does have standing to contest the legality of his own detention. *See United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001) (" '[A]lthough a defendant may lack the requisite possessory or ownership interest in a vehicle to directly challenge a search of that vehicle, the defendant may nonetheless contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the [defendant's] illegal detention' " (*quoting United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000)). Thus, to suppress the gun, Pulliam must show that it is " 'in some sense the product' " of his unlawful detention. *Segura*, 468 U.S. at 815, *quoting Crews*, 445 U.S. at 471.

**[5]** There are several ways a passenger such as Pulliam might show that evidence found in a car is the fruit of his own unlawful detention. He could "show that had he requested to leave the scene of the traffic stop, he would have been able to do so in [the] car." *DeLuca*, 269 F.3d at 1133. Or, he could

---

[1]We disagree with the dissent's suggestion that every detention of a vehicle necessarily curtails the "freedom of action" of its occupants. *Post* at 4550, *quoting Berkemer v. McCarty*, 468 U.S. 420, 436 (1984). Although we do not foreclose a passenger from arguing in a future case that the detention of a vehicle amounted to a seizure of his person, Pulliam makes no such argument. Nor would such an argument succeed on the facts presented, for there is nothing in the record to suggest that the continued detention of the vehicle would have prevented Pulliam from leaving if he was permitted to do so. The reason Pulliam's "freedom of action" was curtailed was that the officers detained *him*, not that they simultaneously detained *the vehicle* in which he had no possessory interest.

show that statements he made or evidence found on his person during his detention prompted the officers to search the car or enabled them to find evidence in it that otherwise would have remained hidden. *Cf. United States v. Martell*, 654 F.2d 1356, 1361 (9th Cir. 1981) (detention which became unlawful due to length of time would taint evidence seized from appellants' suitcases "only if the detention during the unlawful period contributed in some fashion to the search and seizure of the narcotics"; "[s]ince the agents conducted no interrogation of the appellants during the unlawful portion of their detention," evidence was not tainted). In each of these nonexclusive examples, it can be argued that but for the detention, the evidence in the car would not have been found.

**[6]** Here, Pulliam has failed to demonstrate that the gun is in some sense the product of his detention. The officers conducted no interrogation of him before searching the car, and found nothing incriminating during the patdown. Even if they had immediately released him rather than detaining him, the search of the car still would have occurred, and the gun would have been found. The discovery and seizure of the gun was simply in no sense the product of any violation of Pulliam's fourth amendment rights.

B.

Pulliam, however, offers three arguments in support of the district court's ruling which we now address.

1.

First, Pulliam argues that in the unusual circumstances of this case, his detention was the but-for cause of the gun's discovery. He contends in his brief that "it is only because the officers wanted to know about Mr. Pulliam that they stopped the car. . . . Had Mr. Pulliam not been in the car, the car would not have been stopped, and the gun would not have been found." But all this shows is that the officers' purpose

in stopping and searching the car was to investigate Pulliam, not that the gun was in some sense the product of *his detention*. The malfunctioning taillight provided lawful grounds for the stop, regardless of the officers' motivations. *See Whren v. United States*, 517 U.S. 806, 813 (1996) (rejecting the "argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved"). In effect, Pulliam argues that he should be able to seek suppression successfully because he was the "target" of the search. The Supreme Court, however, has decisively rejected that theory. *See Rakas*, 439 U.S. at 132-33 (rejecting the proposition that "any criminal defendant at whom a search was 'directed' would have standing to contest the legality of that search and object to the admission at trial of evidence obtained as a result of the search").[2]

2.

Pulliam also disputes that the relevant "illegality" for purposes of "fruits" analysis is his, and only his, detention. He argues that "[i]n the context of an auto stop, where the connection between the illegal official conduct and the discovery of the challenged evidence is a clear, swift, and unbroken chain, the primary illegality should be considered to be the detention of the car and its occupants — a single official decision." Thus, he contends that a passenger should be able to seek suppression of the "fruits" of all constitutional violations

---

[2]Given the holdings of *Whren* and *Rakas*, we do not agree with the dissent that the officers' supposedly nefarious motives have any relevance in this case. *Post* at 4554. Indeed, even if the officers intended to act unconstitutionally, knowing that standing principles would prevent Pulliam from excluding any evidence they found in the car—a proposition that is unsupported by the record—that, too, would not require suppression of the gun. *See United States v. Payner*, 447 U.S. 727, 731-37 (1980) (evidence illegally seized from third party should not have been suppressed, because defendant lacked standing to seek suppression and federal courts' supervisory power did not permit suppression even where evidence was "tainted by gross illegalities").

that occur during a traffic stop—including those that do not affect the passenger's own fourth amendment rights—because the officials' actions are closely related in time, place, and purpose. In support of this argument, Pulliam has cited decisions allowing passengers to challenge evidence found in vehicle searches following unlawful traffic stops. *See, e.g., Twilley*, 222 F.3d at 1095; *United States v. Colin*, 314 F.3d 439, 442-43, 446-47 (9th Cir. 2002).

**[7]** But *Twilley* and *Collin* are consistent with the standing and causation principles and are distinguishable from this case because they involved *illegal* traffic stops. *See Twilley*, 222 F.3d at 1095 (" '*[I]f the [passenger] could establish that the initial stop of the car violated the Fourth Amendment*, then the evidence that was seized as a result of that stop would be subject to suppression as fruit of the poisonous tree' " (emphasis added) (internal quotation marks omitted) (*quoting Eylicio-Montoya*, 70 F.3d at 1163-64)). Since officials cannot physically stop a car without seizing its passengers, *see Whren*, 517 U.S. at 809-10, a passenger who objects to the legality of a stop effectively is challenging the official action that caused a violation of his own rights. Thus, the standing principle is satisfied. Further, the causation principle is satisfied because evidence found in a vehicle search following an illegal stop "[o]rdinarily . . . will be a product of that stop." *United States v. Arvizu*, 232 F.3d 1241, 1252 (9th Cir. 2000), *rev'd on other grounds*, 534 U.S. 266 (2002).

**[8]** But when, as here, the initial stop is lawful, the situation is different. The continued detention of the vehicle does not necessarily entail the detention of its occupants; they could simply be permitted to walk away. If a passenger is unlawfully detained after the stop, he can of course seek to suppress evidence that is the product of that invasion of his own rights. But a passenger with no possessory interest in a vehicle usually cannot object to *its* continued detention or suppress the fruits of that detention, because "Fourth Amendment rights are personal rights which . . . may not be vicariously assert-

ed." *Rakas*, 439 U.S. at 133-34 (internal quotation marks omitted).

**[9]** We may not amalgamate the separate police actions of detaining the car, detaining each of its occupants, and searching the car, merely because they occurred in close proximity. To do so would be inconsistent with Supreme Court and our own precedent. *See Martell*, 654 F.2d at 1358, 1361 (where appellants claimed that narcotics found in their suitcases was the fruit of their unlawfully prolonged detention, "a conceptual difference exists between the detention of the appellants on the one hand, and the detention of their suitcases on the other"; since the detention of the suitcases was lawful and the appellants' "detention during the unlawful period [did not] contribute[ ] in some fashion to the search and seizure of the narcotics," the unlawful detention did "not taint the search and seizure of the suitcases"); *United States v. Anderson*, 663 F.2d 934, 941-42 (9th Cir. 1981); *cf. Rawlings*, 448 U.S. at 104-06 (defendant who lacked legitimate expectation of privacy in acquaintance's purse could not challenge legality of search of that purse, even though search occurred while both defendant and his acquaintance were allegedly being illegally detained in same house); *United States v. Ayon-Meza*, 177 F.3d 1130, 1133 (9th Cir. 1999) (where defendants challenged procedure by which officer made initial contact with them, each defendant could not object to use of procedure as to other defendants, because "one cannot vicariously assert the Fourth Amendment rights of another").

In *Martell*, we rejected the dissent's argument that the "scope of the fourth amendment violation" should include the entire course of police conduct merely because the simultaneous "seizures of the individuals and suitcases were part of a single, unified police action." *Id.* at 1370 (D. Nelson, J., dissenting). This case involves even stronger reasons to treat the unlawful detention of an individual separately from other simultaneous, but discrete, police actions: while the appellants in *Martell* sought to "combine" their own detention with

another action that also affected their rights (i.e., the search and seizure of their own suitcases), Pulliam proposes that we aggregate his detention with other actions that did not even implicate his fourth amendment interests. The law does not allow this.

Pulliam argues that the Fifth Circuit's decision in *United States v. Jones*, 234 F.3d 234 (5th Cir. 2000), "impliedly" supports his argument. In *Jones*, the appellants conceded that their rented car was lawfully stopped for a traffic violation, but argued that their prolonged detention became unlawful, that the driver's consent to search the vehicle was tainted by the illegal detention, and that evidence found during a search of the car was the fruit of that unlawful detention. *See id.* at 239-40. The majority agreed, and held that the evidence should have been suppressed, without addressing the government's contention that the defendants lacked standing to challenge the vehicle search. *Id.* at 240 n.2. One judge dissented in part, arguing that it did not matter whether the driver validly consented to a search of the car, because the driver had "not met his burden under *Rakas* of demonstrating a possessory interest in the car." *Id.* at 245 (Garza, J., dissenting).

[10] Neither the majority opinion nor the partial dissent in *Jones* specifically addressed the question raised here, which is whether the detention of a car's occupants should be considered separately from the detention of the car. The most Pulliam can say about the *Jones* majority opinion is that it implicitly assumed the detention of the car's occupants was tantamount to detention of the car itself. To the extent that the *Jones* majority opinion suggests that an individual who is unlawfully detained following a lawful vehicle stop may always secure suppression of evidence found in the car, even in the absence of standing to challenge directly the search and where the evidence is not the product of his own detention, we cannot follow it. Under *Martell*, the detention (and search) here of the car and the detention of its occupants were discrete police actions, that were required to be analyzed separately.

Since Pulliam has not argued that the detention of the car could amount to a de facto detention of his person, he "must show that the [evidence] would never have been found but for *his*, and only his, unlawful detention." *DeLuca*, 269 F.3d at 1133. *See also United States v. Carter*, 14 F.3d 1150, 1153-55 (6th Cir. 1994); *United States v. Green*, 275 F.3d 694, 700 (8th Cir. 2001).[3]

---

[3]The dissent argues that we must aggregate the detention of the car with Pulliam's detention because they were prompted by a "single decision" and are "part of a single, integrated instance of unconstitutional police conduct." *Post* at 4550. But there is an obvious inconsistency between that logic and our decision in *Martell*. The dissent attempts to extricate itself by asserting *Martell* is "flawed" and relies on the *Martell* dissent. *Post* at 4552. This is a luxury we cannot embrace, given our duty to follow our precedent. In addition, adopting the dissent's position would have far-reaching consequences. It would permit passengers to suppress not only evidence found in a car, but even evidence seized from other occupants. The dissent's position would undermine the principle that "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." *Rakas*, 439 U.S. at 133-34 (quotation marks omitted).

Our holding hardly "invites police officers to engage in patently unreasonable detentions, searches, and seizures every time an automobile contains more than one occupant." *Post* at 4554. Police will often be unaware before stopping a vehicle whether any of its occupants have a sufficient interest in the vehicle to object to a search of it. Further, a driver given keys and permission to use a car might be able to suppress evidence seized from the car, *see United States v. Portillo*, 633 F.2d 1313, 1317 (9th Cir. 1980), as might a passenger who could show the requisite causal connection between his detention and the evidence found in the car. *See Ante* at 4538 & n.1. Of course, a passenger will also be able to suppress evidence illegally seized from his person. Thus, it is unlikely that police will engage in the sort of rampant illegality envisioned by the dissent.

Finally, it is not "arbitrary" that a passenger's ability to challenge illegally obtained evidence depends on whether he owned the vehicle. *Post* at 4555. This follows directly from the well-established rule that a "defendant's Fourth Amendment rights are violated only when the challenged conduct invaded *his* legitimate expectation of privacy rather than that of a third party." *Payner*, 447 U.S. at 731. Here, Pulliam's counsel conceded at oral argument that if Pulliam had been permitted to leave after exiting the car, Pulliam would be unable to suppress the gun. Thus, it is the dissent's position which is the arbitrary one, for it "would put the police (and society) not in the *same* position they would have occupied if no violation occurred, but in a *worse* one." *Murray v. United States*, 487 U.S. 533, 541 (1988).

3.

Finally, Pulliam contends that in order to break the causal link between his unlawful detention and the seizure of the gun, we must rely on a "perverted variation" of the "inevitable discovery" exception to the fruit-of-the-poisonous-tree doctrine. Pursuant to this exception, evidence that is illegally obtained is nonetheless admissible if it "would inevitably have been discovered through lawful means." *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1396 (9th Cir. 1989). Pulliam assumes that in reasoning that the gun would have been found as a result of the unlawful *search* of the vehicle even if he had not been unlawfully *detained*, we are essentially holding the gun is admissible because the search provides an alternative, inevitable means of discovery. Accordingly, he argues that because the search was unlawful, we are misapplying this exception. *See United States v. Johnson*, 380 F.3d 1013, 1014 (7th Cir. 2004) (rejecting argument that illegally seized evidence was nonetheless admissible because it "had an alternative source in another *illegal* search but one that the defendant could not have challenged directly").

If this case involved any "exception" to the exclusionary rule at all, it would be the "independent source" exception, since the gun was actually found in a search of the car. *See Ramirez-Sandoval*, 872 F.2d at 1396 ("The 'independent source' exception operates to admit evidence that is *actually* found by legal means through sources unrelated to the illegal [conduct]" (emphasis added)).

**[11]** We do not, however, have to apply either "exception" in this case because the indispensable causal connection between his detention and discovery of the gun has not been met. The requisite but-for causation is missing not only because the gun was found as a result of the search, but because his detention simply did not contribute or lead to the gun's discovery. To illustrate this point, assume that Pulliam never got into the car with Richards, but instead walked off

on his own while Richards drove away with the gun in the car. Imagine further that the officers stopped the car, found the gun, learned that it belonged to Pulliam, and then went to Pulliam's home and illegally detained him. In this hypothetical situation, the gun's discovery is not the product of Pulliam's illegal detention, since the gun was found before the detention even occurred. To say that the gun would have been found even if he had not been detained is merely to recognize that the illegality, on its own, is not a sufficient or even a contributing cause of the gun's discovery. The gun would thus be admissible without any consideration of an "exception" to the exclusionary rule.

The situation here is analytically identical to this hypothetical scenario. The only difference is that Pulliam was in the car and was detained by its side, but the detention itself was not the but-for cause of the gun's discovery in the same sense as in the hypothetical situation. Thus, there is no need to apply the inevitable discovery or independent source doctrines and ask whether some other alternative means of discovery breaks the causal link. Nor need we consider whether unlawful alternative means can be used for purposes of these exceptions. We simply do not reach these issues.

**[12]** The district court therefore erred in suppressing the gun.

REVERSED and REMANDED.

WARDLAW, Circuit Judge, dissenting:

I respectfully dissent.

The government concedes that the officers' sole purpose for following, stopping, and searching the car in which the gun was found was to investigate Pulliam. Although the dis-

trict court found that the officers lawfully stopped the car, it held—and the government concedes—that the officers unlawfully detained the car and its passengers, and unlawfully searched the car. The district court suppressed Pulliam's statements made while he was detained, the cash found in his pocket, and the gun,[1] ruling:

> [The officers had] a valid reason for stopping [the car], which was the taillight being out. I think everything after that was manufactured, however, including this rolling stop, thinking that the car was trying to get away from them and all that. None of that is reasonable.

Indeed, the district court found that all of the reasons proffered by the officers to support reasonable suspicion for the detention of Richards and Pulliam and the subsequent search of the car were lies, holding:

> *Everything* that these officers have come up with in order to provide what they have considered to be reasonable suspicion *is manufactured* in my mind. They started out by even saying what it is that they wanted. And they were after that. And they had a basis for stopping the vehicle. There is no doubt about it. But they had no reasonable basis for then going farther.[2]

Therefore, the only issue we are confronted with is whether a defendant may successfully move to suppress evidence found in a car in which he was a passenger where the car and its occupants were legally stopped but unlawfully detained.

---

[1]The government appealed only the suppression of the gun.

[2]The majority disregards this factual finding by the district court, and thus errs when it treats the officers' "manufactured" statements as true. *See ante* at 4534-35.

Although this is an issue of first impression in our circuit, our vehicular stop cases provide a framework for resolving it. Those cases hold that although a defendant may lack the requisite possessory or ownership interest in a vehicle to directly challenge a search of that vehicle, the defendant may nonetheless contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of that illegal detention. *See, e.g.*, *United States v. Colin*, 314 F.3d 439, 442-43 (9th Cir. 2002) ("[O]ccupants of a vehicle have standing to challenge on Fourth Amendment grounds an officer's stop of their vehicle even if they have no possessory or ownership interest in the vehicle."). To successfully suppress evidence as the fruit of an unlawful detention, a defendant must establish that the detention violated his Fourth Amendment rights, and that, "but for the illegal actions of the police," *Wong Sun v. United States*, 371 U.S. 471, 488 (1963), the evidence would not have been discovered. *See United States v. Twilley*, 222 F.3d 1092, 1095-96 (9th Cir. 2000).

Here, the government concedes that the officers lacked authority to detain the car and its occupants. In addition, it is clear that, but for the illegal actions of the police in detaining the car and its passengers, the gun would not have been discovered. Therefore, the district court correctly granted Pulliam's motion to suppress.

The majority goes astray because instead of viewing the concededly illegal detention of the car and its occupants as the "primary illegality," it narrowly construes the law to require a showing that the gun was the product of "[Pulliam's], and only [Pulliam's], unlawful detention." *Ante* at 4544; *see United States v. DeLuca*, 269 F.3d 1128, 1146 (10th Cir. 2001) (Seymour, J., dissenting). Contrary to the majority's analysis, in our vehicular stop cases we have repeatedly focused on the illegal detention of the vehicle and its occupants as the unconstitutional police conduct and examined whether the illegally seized evidence is the fruit of that detention. *See, e.g.*, *Colin*, 314 F.3d at 446 ("In sum, we conclude

Carmichael did not have reasonable suspicion to stop Estrada-Nava and Colin based on lane straddling or driving under the influence. As a result, the methamphetamine he seized through the search of their vehicle should have been suppressed."). In those cases, we have held that the "but for" link between the illegal conduct and discovery of evidence in the car was apparent given the proximity in time and location of the events, and the unbroken link between them. *See, e.g.*, *United States v. Arvizu*, 232 F.3d 1241, 1252 (9th Cir. 2000) (reversing district court's denial of motion to suppress, stating that "ordinarily, when a car is illegally stopped, the search that follows will be a product of that stop"), *rev'd on other grounds*, 534 U.S. 266 (2002); *Twilley*, 222 F.3d at 1097 (reversing defendant's conviction, stating that "[t]he government has not shown that there was a break in the chain of events sufficient to refute the inference that the search and the resulting seizure of the cocaine were products of the stop"); *United States v. Millan*, 36 F.3d 886, 890 (9th Cir. 1994) (reversing district court's denial of motion to suppress, stating that "[b]ecause the interrogation and search were a direct result of the illegal stop, we hold that all of the evidence must be suppressed"). None of our vehicular stop cases analyzes the stop of the vehicle and the unlawful detention of its occupants as discrete, independent actions, as the majority does here. They have instead uniformly considered the illegal detention of the vehicle and its occupants together in their fruits analysis.

The majority reasons that "when, as here, the initial stop is lawful, the situation is different" because "[t]he continued detention of the vehicle does not necessarily entail the detention of its occupants; they could simply be permitted to walk away." *Ante* at 4541. But this is too fine a line to draw in our Fourth Amendment jurisprudence.

Passengers in vehicles that are unlawfully stopped also "could simply be permitted to walk away." *Ante* at 4541. However, because "[c]ertainly few motorists would feel free

. . . to leave the scene of a traffic stop without being told they might do so," the Supreme Court has long acknowledged that " 'stopping an automobile and detaining its occupants constitute a "seizure" within the meaning of [the Fourth] Amendmen[t], even though the purpose of the stop is limited and the resulting detention quite brief.' " *Berkemer v. McCarty*, 468 U.S. 420, 436-37 (1984) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)) (alterations in original). For this reason, we have focused on the detention of the vehicle and its occupants as the "primary illegality" in our vehicular stop cases.

Like illegally stopping an automobile, unlawfully detaining a vehicle after a legal stop "significantly curtails the 'freedom of action' of the driver and the passengers, if any, of the detained vehicle." *Id.* at 436. This is especially true in this case, where the government admits that once the car stopped, "the officers got out of their patrol car and, with their guns drawn and aimed low, ordered the driver and Pulliam out of the car" for a pat down search. Even short of the overt threat of force in this case, and the unlawful detention that followed, it is illogical to assume that any passenger would walk away from a vehicle and driver that have been stopped and detained by the police.

Therefore, there is no principled reason to distinguish between a situation involving an illegal stop, in which case a passenger may suppress evidence found as a result of the illegal stop, *see, e.g.*, *Colin*, 314 F.3d at 442-43, and a situation involving a legal stop but illegal detention, in which case, according to the majority's analysis, a passenger may not suppress evidence found as a result of the illegal detention. For purposes of the fruits analysis here, we must focus on the detention of the vehicle and its occupants as the "primary illegality," for they all stemmed from the officers' single decision to detain and search the car, Pulliam, and the driver. The detention of the vehicle and the detention of its occupants are part of a single, integrated instance of unconstitutional police conduct.

The Circuits appear to be split on this question. The Fifth Circuit has assumed that the primary illegality is the detention of the vehicle and its occupants. *See United States v. Jones*, 234 F.3d 234 (2000). *But see DeLuca*, 269 F.3d at 1130-35; *United States v. Carter*, 14 F.3d 1150, 1151-55 (6th Cir. 1994). As in this case, the defendants in *Jones* did not challenge the initial stop of the vehicle, but rather asserted that the officers' continued detention of the vehicle was unreasonable under the circumstances and exceeded the scope of the initial stop. *Jones*, 234 F.3d at 240. In contrast to the majority in this case, however, the Fifth Circuit analyzed the district court's suppression ruling in the exact same manner with respect to both defendants, even though one of the defendants did not own or possess the vehicle. Finding that the prolonged detention of the vehicle violated the Fourth Amendment and the driver's consent did not cure the violation, the Fifth Circuit held that the evidence found in the vehicle should have been suppressed in both defendants' cases. *Id.* at 244. Unlike the majority, the Fifth Circuit did not require the passenger to demonstrate that, but for his, and only his, illegal detention, the evidence would not have been found. Even the dissent in *Jones* assumed that both the driver and passenger could challenge the admissibility of the drugs as fruits of the poisonous tree. *Id.* at 244 (Garza, J., dissenting).[3]

Perhaps the majority's error lies in confusing standing analysis with "fruit of the poisonous tree" analysis. *See DeLuca*, 269 F.3d at 1145-46 (Seymour, J., dissenting).[4] An owner of a vehicle must be distinguished from a passenger or driver for purposes of determining standing because generally only an

---

[3]In addition to the Fifth Circuit, a respected treatise supports the view that in the circumstances presented here, courts should focus on the detention of the car and its occupants as the "primary illegality." *See* Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 11.4(d), at 313-15 (4th ed. 2004).

[4]This confusion is further illustrated by the majority's response to this dissent, which again reverts to standing analysis rather than the "fruit of the poisonous tree" doctrine upon which the majority relies.

owner has standing to directly challenge the illegal search of his vehicle. *See Rakas v. Illinois*, 439 U.S. 128, 148-49 (1987) (holding that a passenger who asserts neither a possessory nor a property interest in a vehicle lacks standing to challenge the illegal search of the vehicle). Once the issue of standing has been resolved, however, we have conducted the fruits analysis in the identical manner regardless of whether the defendant was the owner of the car or a passenger. Our vehicular stop cases have uniformly considered passenger, driver, and owner together for purposes of analyzing whether evidence is fruit of the illegal detention of the vehicle and its occupants. *See Colin*, 314 F.3d at 442-43; *Twilley*, 222 F.3d at 1095.

The majority reasons that to amalgamate the police actions of detaining the car and detaining each of its occupants would be inconsistent with our decision in *United States v. Martell*, 654 F.2d 1356 (9th Cir. 1981). *Martell* is not a vehicular stop case, however, and thus is distinguishable on its facts alone. Moreover, the *Martell* majority's "fruit of the poisonous tree" analysis is seriously flawed, as Judge D. Nelson pointed out in her dissent in that case. Like the majority here, the *Martell* majority disconnected the dots between the challenged evidence and the illegal detention that gave rise to it. *See LaFave*, § 11.4(d), at 313 (criticizing *Martell* for "avoid[ing] a 'fruits' connection between the challenged evidence and the preceding illegal detention of the defendant[s] by disconnecting that detention from the larger illegality of which it [was] a part").

In *Martell*, the defendants were detained at an airport just as they were to board a flight. Twenty minutes after their initial detention, the defendants were escorted to a police office, where a narcotics detector dog was allowed to "sniff" their luggage. After the dog gave a positive alert for narcotics in the suitcases, the defendants were transported to a narcotics task force office in another end of the airport. The trial court held that probable cause first arose at the time of the alert. The defendants were detained in the narcotics office for four

hours until a search warrant was obtained, at which time the suitcases were searched, a large quantity of cocaine was found, and the defendants were arrested.

We affirmed the denial of the defendants' motion to suppress, reasoning that the detention of the luggage was reasonable even if the detention of the defendants was not, so that any illegal detention of the defendants "would not taint the search and seizure of the suitcases." *Id.* at 1361. As here, the dissenting opinion criticized the majority for slicing and dicing the unlawful police conduct, stating:

> Here, the seizures of the individuals and suitcases were part of a single, unified police action. The majority chooses to slice a lesser included intrusion (seizure of the suitcases) from the simultaneous greater intrusion (unlawful arrest) that began at the inception of contact with the defendants. This is a unique approach to fourth amendment adjudication. . . . The majority cites no precedent for fragmenting a unified, simultaneous action into isolated parts for analysis. Such an approach would seem to be contrary to the deterrent policy behind the exclusionary rule. In light of that policy, I cannot approve the judicial technique of winnowing a fortuitous "lawful" facet out of an otherwise unlawful incident. I see no reason for courts artificially to bifurcate police actions on a post hoc basis in an attempt to evade the exclusionary rule.

*Id.* at 1370 (citation omitted).

The majority opinion also finds no support in the logic of the Fourth Amendment. *See DeLuca*, 269 F.3d at 1146-48 (Seymour, J., dissenting). The core rationale for extending the exclusionary rule to evidence that is the fruit of unlawful police conduct is that "this admittedly drastic and socially costly course is needed to deter police from violations of con-

stitutional and statutory protections." *Nix v. Williams*, 467 U.S. 431, 442-43 (1984). The Supreme Court has accepted the argument "that the way to ensure such protections is to exclude evidence seized as a result of such violations notwithstanding the high social cost of letting persons obviously guilty go unpunished for their crimes." *Id.* at 443.

The majority undermines this rationale. Indeed, it "provides positive encouragement for Fourth Amendment violations by telling [police officers] that there are potential law enforcement benefits to be derived, at least against passengers, in [unlawfully detaining vehicles and their passengers] even when, as [here], such action is flagrantly illegal." *LaFave,* § 11.4(d), at 315 (stating that the Tenth Circuit's decision in *DeLuca*, which the majority follows here, "is ludicrous"). The majority opinion invites police officers to engage in patently unreasonable detentions, searches, and seizures every time an automobile contains more than one occupant. Should something be found, only the owner of the vehicle will be able to successfully move to suppress the evidence; the evidence will be admissible against the other occupants. After this decision, police officers will have little to lose, but much to gain, by legally stopping but illegally detaining vehicles occupied by more than one person.

Indeed, the policy considerations for excluding evidence seized as a result of constitutional violations is particularly strong here, where the officers admitted that their reasons for pursuing the vehicle were merely pretext to investigate Pulliam. Although I agree with the majority that Pulliam should not be able to successfully seek suppression simply because he was the "target" of the search, it is undeniably true that the officers achieved their sole goal of identifying and ultimately arresting Pulliam through unconstitutional means. The majority's logic is inconsistent with the Supreme Court's teaching that "the prosecution is not to be put in a better position than it would have been in if no illegality had transpired." *Nix*, 467 U.S. at 443.

The majority's rule is also arbitrary. It creates situations where a person's ability to challenge illegally obtained evidence will turn on the fortuity of whether he is the owner of the vehicle in which he was a passenger. "There is no difference from a policy standpoint between permitting the police to use unconstitutionally seized evidence against an illegally detained passenger and using it against an illegally detained automobile owner." *DeLuca*, 269 F.3d at 1147 (Seymour, J., dissenting).

Finally, the majority "comes dangerously close to creating a right without a remedy, something which is strongly disfavored in American jurisprudence." *Id.* at 1148. Under the majority's holding, while a passenger may theoretically challenge his illegal detention, he will have no remedy because he will be unable to satisfy the implausible requirement that he prove that had he requested to leave the scene of the traffic stop, he would have been able to do so in the car in which he was a passenger. *See ante* at 4538.

Despite the majority's opinion, most police officers will continue to do their jobs as best they can in accord with the Fourth Amendment. But, as Justice White stated in *Rakas*:

> [T]he very purpose of the Bill of Rights was to answer the justified fear that governmental agents cannot be left totally to their own devices, and the Bill of Rights is enforceable in the courts because human experience teaches that not all such officials will otherwise adhere to the stated precepts. Some policemen simply do act in bad faith, even if for understandable ends, and some deterrent is needed.

*Rakas*, 439 U.S. at 169 (White, J., dissenting). Because I cannot go along with the majority's parsimonious approach to the Fourth Amendment, I would affirm.