FILED
United States Court of Appeals
Tenth Circuit

August 21, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

SCOTT A. JARVI,

Defendant-Appellant.

No. 07-3200

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. NO. 06-CR-10264-MLB)**

---

Stephen W. Kessler, Topeka, Kansas, for Defendant-Appellant.

Brent I. Anderson, Assistant United States Attorney (Eric F. Melgren, United States Attorney, with him on the briefs), Wichita, Kansas, for Plaintiff-Appellee.

---

Before **HENRY**, Chief Circuit Judge, **BRORBY** and **McCONNELL**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

---

Scott Jarvi pled guilty in federal court to possessing, with intent to distribute, at least 5 grams of methamphetamine. Wichita police officers discovered the meth in two places—in his pick-up truck during a traffic stop, and

in his house during a later search. The government conceded that the search of his truck was illegal, and Mr. Jarvi argued unsuccessfully that the meth seized in his house should be suppressed as well. He had no appreciable criminal history and received a 90-month sentence. On appeal, Mr. Jarvi argues that all of the meth should have been suppressed; he also argues that the district judge violated his right to speak on his own behalf at sentencing. We affirm the district judge's ruling on the search, but conclude that Mr. Jarvis's right to allocution was violated. We therefore remand the case to district court with instructions to vacate the sentence and resentence.

## I. BACKGROUND

Like many drug offenders, Scott Jarvi's legal troubles began when the police stopped his truck for a traffic violation. During the stop police discovered drugs, although the record from the suppression hearing does not allow us to establish a conclusive chronology. From statements of counsel, we know that at some point police asked Mr. Jarvi for permission to search his truck, which he refused, and that eventually police brought a dog, searched the vehicle, and found approximately 56 grams of methamphetamine. The police also asked Mr. Jarvi's passenger, Rhonda Higgins, if they could search her purse. When they did they found pills, which she claimed were prescription medication. The police arrested her under the theory that it was illegal to carry medication without physically

possessing the prescription at all times. (So far as we know, there is no such law in Kansas.)

After she was brought into custody, Ms. Higgins told the police that Mr. Jarvi had more methamphetamine at his residence and that she had previously used drugs there. On the basis of this information, police acquired a warrant to search Mr. Jarvi's house. There they found approximately 23 grams of methamphetamine mixture as well as two handguns, a .22 caliber rifle, and a little more than $15,000 in cash. The guns and nearly all of the cash were in the bedroom closet, while the drugs were upstairs in the attic of the house.

Mr. Jarvi attempted to suppress the drugs under the theory that the search of both his vehicle and his house violated the Fourth Amendment. At the suppression hearing, the government conceded that the drugs found in the truck could be suppressed, and the defendant conceded that the initial traffic stop was valid. The government then presented testimony from the officer who had interviewed Ms. Higgins and searched Mr. Jarvi's house. The government began to present testimony from a second officer to confirm that both Mr. Jarvi and Ms. Higgins had given their names during the traffic stop—it is unclear why this was important—and after the district court expressed puzzlement at this line of inquiry, defense counsel offered to stipulate to it. R. Vol. II, at 41. The defense declined to call any witnesses, and the district court then commented: "Didn't seem like there would be any reason for the Defendant to have any witnesses at

this point." R. Vol. II, at 42.  Finding that Ms. Higgins's statements provided probable cause for the search warrant and that Mr. Jarvi lacked standing to assert any violations of her rights during the course of the traffic stop or interrogation, the court issued a written order denying Mr. Jarvi's motion to suppress the drugs found in his house.  R. Vol. I, Doc. 21.

After Mr. Jarvi pled guilty, the case proceeded to sentencing.  The 22.73 grams of methamphetamine mixture found in Mr. Jarvi's house would ordinarily carry a base offense level of 20, U.S.S.G. § 2D1.1, but the Presentence Report recommended that the cash found in Mr. Jarvi's house be "converted to its methamphetamine equivalent."  R. Vol. VI, at 8.  Using an estimate of $500 per ounce, *see* U.S. Dep't of Justice, National Drug Intelligence Center, *National Illicit Drug Prices*, at 33 (2006), the PSR held Mr. Jarvi accountable for another 853.05 grams of methamphetamine mixture, which drove his offense level up 12 points to 32.[1]  The PSR also recommended a 2-point enhancement for the firearms and a 3-point reduction for acceptance of responsibility.  Mr. Jarvi's lawyer filed a written objection to the enhancement for the guns, arguing that the guns belonged to Mr. Jarvi's son and had no connection to his offense.  He did not make the same objection to the cash.  Mr. Jarvi's Criminal History score was

---

[1] If this amount of methamphetamine were converted to "methamphetamine (actual)"—as Mr. Jarvi's *pro se* motion also appeared to contemplate—these offense level calculations may be somewhat different.  However this is not the approach taken by the PSR, it is not discussed on appeal, and we do not confront it here.

I, because his only prior convictions were for two misdemeanors almost twenty years ago.

Mr. Jarvi, however, filed a written *pro se* motion containing objections of his own. He objected that the guidelines did not authorize the conversion of his cash into drug quantities, that *National Illicit Drug Prices* did not provide the proper conversion rate, and that the enhancement for the guns was factually unsupported. He also asked the sentencing court to "consider my age, legitimate employment history, lack of a criminal record and the likelihood of recidivism." R. Vol. I, Doc. 28. Finally, he provided repeated citations to the "safety valve" of 18 U.S.C. § 3553(f), which authorizes a sentence below the mandatory minimum for nonviolent offenders in some circumstances. *See United States v. Jackson*, 493 F.3d 1179, 1180 (10th Cir. 2007) ("By virtue of their comparatively 'clean' records, Congress has instructed that individuals with but a single criminal history point may be eligible for the so-called 'safety valve' reduction . . . .").

At the start of the sentencing hearing, the court inquired about the *pro se* motion and Mr. Jarvi's lawyer said: "I ask the court rule upon his written motions." The court refused, saying: "He has a lawyer. He has a good lawyer. Mr. Jarvi, it's up to you, if you felt that these objections were something that should be raised, for you to talk to Mr. Schoenhofer about them and for him to raise them. It's not my habit to entertain *pro se* pleadings when the Defendant has a lawyer. So those *pro se* pleadings are stricken from the record." R. Vol.

IV, at 3. The judge then heard arguments and evidence about the guns, found that they did not have any "temporal and spatial relationship to the drugs," and denied the enhancement. R. Vol. IV, at 5.

The judge next turned to the rest of the PSR. He asked Mr. Jarvi if he had read it and discussed it with his lawyer. Mr. Jarvi responded that he had. The judge then asked, "[K]eeping in mind that I'm not going to consider these pro se objections that you've made to the presentence report, are there any other aspects of the presentence report that you would object to?" R. Vol. IV, at 7. Mr Jarvi attempted to bring forward the Guideline Manual himself and object to his "base offense level," but the judge replied, "that's in the pro se. I told you I wasn't going to listen to those." R. Vol IV, at 8. After speaking with his lawyer, Mr. Jarvi tried again, but the judge rebuked him: "I'm not going to listen to the pro se written objections that you already filed." R. Vol. IV, at 8. The district judge announced that he "intend[ed] to impose a sentence within th[e] advisory guideline range," and asked the lawyers for each side for their positions. R. Vol. IV, at 9. Both sides requested the low end of the guidelines range. Finally, the court once more asked the defendant if he had anything to add, and Mr. Jarvi requested that the judge recommend placement in a drug treatment program and incarceration near his family in Minnesota. The judge sentenced him to 90 months in prison. Mr. Jarvi then appealed.

## II. SUPPRESSION

We first consider Mr. Jarvi's claim that the district court should have suppressed the drugs found in his house because the information contained in the warrant application was the "fruit of the poisonous tree"—in other words, that it was derived from an illegal part of the encounter at his truck. The poisonous tree doctrine allows a defendant to exclude evidence "come at by exploitation" of violations of his Fourth Amendment rights. *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963). The evidence in question was obtained via a search warrant for his house, which was based on evidence given by Ms. Higgins. Mr. Jarvi argues that the statements made by Ms. Higgins could not be used to obtain the warrant because they were the product of Fourth Amendment violations.

However, "defendants charged with crimes of possession may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have in fact been violated." *United States v. Salvucci*, 448 U.S. 83, 85 (1980). In cases where multiple defendants are searched, *Salvucci* means that the defendant may not exclude evidence that has been "come at by exploitation" of a violation of *somebody else's* rights.[2] Our precedents regarding the intersection of these two

---

[2] This principle is often called Fourth Amendment "standing," but that is a misnomer. *See United States v. Smith*, 531 F.3d 1261, 1266 n.2 (10th Cir. 2008). Mr. Jarvi unquestionably has "standing" (in a jurisdictional sense) to challenge the legality of his detention and the search of his home; the question before us is a substantive one of whether his Fourth Amendment rights have been violated. *See Rakas v. Illinois*, 439 U.S. 128, 140 (1978).

doctrines place the burden on the defendant to demonstrate a "factual nexus" between a violation of his own Fourth Amendment rights and the discovery of the challenged evidence. *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000) (internal citations omitted) ("At a minimum, a defendant must adduce evidence at the suppression hearing showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct."). Because the burden of proof was on Mr. Jarvi and he put forward insufficient evidence to support this theory at the suppression hearing, we affirm the district court's ruling.

The traffic stop can be divided into three relevant parts: the initial stop of Mr. Jarvi's truck, the detention after the stop, and the ultimate search of the truck. Mr. Jarvi conceded that the stop was legal and the government conceded that the ultimate search was illegal; but the parties do not agree about the detention and did not make a stipulation below. Mr. Jarvi urges us to conclude from the government's concession about the search that the detention was also illegal. Aplt.'s Br. 10–11. But the illegality of the search does not logically entail that the detention was illegal too: absent consent, the ultimate search required probable cause, but the detention required only reasonable suspicion. *See, e.g.*, *United States v. Patten*, 183 F.3d 1190, 1193, 1195 (10th Cir. 1999).

Moreover, we have little evidence about the relationship of the detention—even if it were shown to be illegal—to the questioning of Ms. Higgins

that ultimately produced the search warrant. At some point, we gather that police questioned Ms. Higgins, searched her purse, and arrested her. Once arrested, she gave the information necessary to acquire a warrant to search Mr. Jarvi's house. But we do not know the causal, or even the temporal, relationship of Mr. Jarvi's detention and the search of his truck to the search, arrest, and eventual interrogation of Ms. Higgins. Ms. Higgins consented to the search of her purse. It is conceivable that this occurred only because of an unconstitutionally prolonged detention of Mr. Jarvi, or because of suspicions aroused by the discovery of the drugs in Mr. Jarvi's truck. But the record does not show this. For all the record reveals, the officers could have spoken to Ms. Higgins and requested permission to search her purse during the ordinary course of the traffic stop, in which case no Fourth Amendment violation of her rights occurred. Or the questioning of Ms. Higgins and resultant request to search could have been predicated on the officers' decision to detain Ms. Higgins in her own right, based on something less than reasonable suspicion, in which case her Fourth Amendment rights might have been violated, but not Mr. Jarvi's. There is no suggestion that Ms. Higgins's arrest for violation of what appears to be a non-existent violation of Kansas law was a result of any violation of Mr. Jarvi's rights.

In light of the burden of proof, this lack of information dooms Mr. Jarvi's motion for suppression. To suppress evidence as the fruit of his unlawful

detention or unlawful search, Mr. Jarvi "must make two showings: (1) that the detention [or search] did violate his Fourth Amendment rights; and (2) that there is a factual nexus between the illegality and the challenged evidence." *United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001) (internal quotation marks omitted). If he makes those showings, then the government may attempt to show that the taint has nonetheless been dissipated by inevitable discovery, attenuation, or the like. *Id.*[3] In other words, Mr. Jarvi must show that if police had not searched his truck (or unlawfully detained him, if that violation were shown), they would not have ended up questioning Ms. Higgins and learning about the drugs in his house. *See, e.g., Pulliam v. United States* , 405 F.3d 782, 787 (9th Cir. 2005) (setting forth the various ways the defendant could have shown a nexus, including by demonstrating that "the statements he made . . . prompted the officers to search the car or enabled them to find evidence in it that otherwise would have remained hidden"). In his appellate briefs, Mr. Jarvi claims that "it's clear that Ms. Higgins['s] statements would not have been made but for the illegal

---

[3] The *DeLuca* opinion goes on to hold that the third party standing doctrine means that to "demonstrate the required factual nexus, [the defendant] must show that the methamphetamine would never have been found but for his, *and only his*, unlawful detention [or search]." *Id.* at 1133 (emphasis added). That extension has been criticized: by a dissenting judge in that case, *id.* at 1135–49 (Seymour J., dissenting), by other circuits, *United States v. Mosley*, 454 F.3d 249, 254–55 & n.11 (3d Cir. 2006), and by commentators, 6 Wayne R. LaFave, *Search and Seizure* § 11.4. In this case, we rely only on *DeLuca*'s holding that the defendant bears the burden of proof in establishing the connection between his rights and the uncovered evidence.

detention[,] arrest and search of the appellant." Aplt's Br. at 16. But he offers no reason why this would be true, and the record reveals none. Absent *any* information presented at the hearing about whether his detention was illegal, or how the questioning of Ms. Higgins related to the arguably illegal detention and the concededly illegal search, we cannot conclude that Mr. Jarvi met his burden before the district court.

## III. SENTENCING

On appeal, Mr. Jarvi also raises a number of procedural objections to the reasonableness of his sentence: that he was not permitted to address the court on his own behalf in allocution of his sentence, that the judge erroneously held him accountable for much more methamphetamine than he ever possessed or sold, and that the judge failed to take into account his age, employment history, substantially clean criminal record, and low likelihood of recidivism. We conclude that Mr. Jarvi must be resentenced because his right to allocution was violated. Because Mr. Jarvi's other challenges to his sentence may be resolved on resentencing, we remand for the district court to reconsider them in the first instance.

### A. Allocution

Rule 32 charges that "before imposing sentence, the court must . . . address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence." Fed. R. Crim P. 32 (i)(4)(A)(ii). This rule

codifies the common law right of allocution at sentencing. *Green v. United States*, 365 U.S. 301, 304 (1961). The Supreme Court has told us that "[a]s early as 1689, it was recognized that the court's failure to ask the defendant if he had anything to say before sentence was imposed required reversal." *Id.* (citing *Anonymous*, 3 Mod. 265, 266, 87 Eng. Rep. 175 (K.B.).[4] Mr. Jarvi claims that the district court's repeated refusal to let him address the court with arguments "to mitigate the sentence" denied him his right to allocution and requires a remand. We agree.

To be sure, the sentencing judge did ask Mr. Jarvi if he had anything to say about the PSR or his sentence, three times. However, both times that Mr. Jarvi attempted to speak to one of the issues he thought most relevant to his sentence—the fortyfold increase in drug quantity caused by converting the money in his house into drugs—the judge told Mr. Jarvi that he was "not going to listen" to any argument that had appeared in the *pro se* motion. R. Vol. IV, at 8. By ordering him not to make those arguments, the judge therefore failed to "permit the defendant to speak or present any information to mitigate the sentence." Fed. R. Crim P. 32 (i)(4)(A)(ii).

The government argues that Mr. Jarvi's "opportunity to speak on his own behalf" was "adequate," Gov't Br. 37, because the judge did let him speak to issues *not* mentioned in the *pro se* motion: in particular to request drug treatment

---

[4]It is difficult to see how this could be categorically true, since there was no general right of appeal in criminal cases in the federal system until the Judiciary Act of 1891. But we get the point. Allocution is important.

and incarceration near Minnesota.  But Mr. Jarvi evidently regarded the arguments in his motion as his best case for mitigating the sentence: this is why he wrote them down and submitted them to the court beforehand.  Because Mr. Jarvi was proceeding through counsel, the district court was within its discretion not to consider the *pro se* motion in connection with challenges to the PSR.  But when it comes to allocution, the defendant has a broad right to "present *any* information to mitigate the sentence," R. 32 (i)(4)(A)(ii) (emphasis added), and that right is not forfeited by the defendant's unjustified attempt to present the information earlier in a different form.  In *United States v. Sarno*, 73 F.3d 1470, 1503–04 (9th Cir. 1995), the Ninth Circuit held that a defendant had been denied his right of allocution when the Court invited him to speak, but only as to "what would be the appropriate sentence within th[e Guidelines] range."  *Id.* at 1503–04.  If that was an error when the Sentencing Guidelines were mandatory, it is even more important now that the Guidelines are advisory to allow the defendant an opportunity to argue for a variance from the Guidelines range.

The government relies on *United States v. Muñiz*, 1 F.3d 1018 (10th Cir. 1993), where we held that a defendant's right of allocution was not violated when the court told the defendant at sentencing not to reargue a Sixth Amendment speedy trial issue that had already been extensively litigated.  "The judge did not unfairly prevent Muñiz from speaking," we explained, "because the judge does not have to let the defendant re-argue the case at sentencing."  *Id.* at 1025.  But *Muñiz*

-13-

is distinguishable on two grounds. First, Muñiz was making arguments about supposed violations of his rights at trial, not attempting to bring forward "information to mitigate [his] sentence." Fed. R. Crim. P. 32(i)(4)(A)(ii). Mr. Jarvi, on the other hand, was not trying to bring irrelevant arguments from one phase into the other. Second, Mr. Muñiz was *re*-arguing claims that had already been raised and ruled on. Mr. Jarvi, in contrast, was attempting to make his arguments *for the first time*. The district judge had refused on procedural grounds to hear, or rule on, the arguments in Mr. Jarvi's *pro se* motion. Mr. Jarvi is entitled to have considered—at least once—his arguments for mitigation of his sentence under 18 U.S.C. § 3553(a).

## B. Remand

The government concedes that a denial of allocution is per se prejudicial and requires a remand without an investigation of prejudice. Gov't Br. 35. *See United States v. Torres-Palma*, 290 F.3d 1244 (10th Cir. 2002). Mr. Jarvi also raises other challenges to his sentence on this appeal: the 12-point increase in his offense level that came from converting the cash found in his residence into quantities of methamphetamine mixture, and the district court's failure to take into account his age, employment history, criminal history, and likelihood of recidivism in fashioning a sentence under § 3553(a). Because, as we will explain, these are issues which may be resolved by the remand for allocution, we decline to

resolve them here and give the district court the first opportunity to address them on remand.

### 1. Relevant Drug Quantities

Mr. Jarvi's motion challenged the PSR's conclusion that he should be sentenced for possession of 853.05 grams of methamphetamine—calculated from the cash found in his apartment—in addition to the 22.73 grams of methamphetamine mixture actually found there. The guidelines provisions for related conduct allow a drug offender to be sentenced for cash "in a case where cash is seized and where either no drug is seized or the amount seized does not reflect the scale of the offense . . . provided the court finds by a preponderance that the cash is attributable to drug sales which were part of the same course of conduct or common scheme or plan as the conviction count." *United States v. Rios*, 22 F.3d 1024, 1028 (10th Cir. 1994). Yet it is not clear whether the cash seized here was "part of the same course of conduct" as Mr. Jarvi's count of methamphetamine possession. The district court made no such factual finding. Significantly, the district court found the evidence of a nexus lacking with respect to the two guns found in the closet along with the money. After the government presented evidence on the subject, the court found that the guns did not have a "temporal and spatial relationship to the drugs." R. Vol. IV, at 5. The guns and money were in the same closet; the drugs were in the attic. It is possible that if it

-15-

reached the issue, the court would reach the same conclusion with respect to the cash that it did with respect to the guns.

Mr. Jarvi's lawyer did not object to this enhancement within 14 days after receiving the presentence report, as required by Rule 32(f)(1). However, if an objection is not made under Rule 32(f)(1), a sentencing court may nonetheless "for good cause, allow a party to make a new objection any time before sentence is imposed." Fed. R. Crim. P. 32(i)(1)(D). Thus, on remand the district court should determine whether there is "good cause" to allow Mr. Jarvi to object to this conversion. *See, e.g.*, *United States v. Angeles-Mendoza*, 407 F.3d 742, 749 & n. 11 (5th Cir. 2005). If so, and if the objection has merit, the advisory Guidelines range may be substantially lower than 87–108 months. Furthermore, even if no formal objection to the Guidelines range is timely, the substance of this argument may also be ground for a variance.

### 2. Age, Employment, Criminal Record

Mr. Jarvi also argues that the district court failed to adequately weigh or discuss the relevance of some of his personal characteristics: his age (Mr. Jarvi is 49), his employment history (he worked for fifteen years as an aircraft inspector after serving in the army), or his criminal record (he has only two misdemeanor convictions, nearly twenty years old).

We have now held that district courts have broad discretion to consider individual characteristics like age, employment, and criminal history in fashioning

an appropriate sentence under 18 U.S.C. § 3553(a), even when disfavored under the Guidelines or already accounted for in another part of the calculation. *See, e.g.*, *Gall v. United States*, 128 S. Ct. 586, 601 (2007) (courts may consider age despite its being a disfavored factor); *United States v. Huckins*, 2008 WL 2514460, No. 07-3220, *5 (10th Cir. June 25, 2008) ("[A] district court may weigh a defendant's lack of a criminal record, even when the defendant has been placed into a criminal history category of I, in its § 3553(a) analysis"); *United States v. Muñoz-Nava*, 524 F.3d 1137, 1148–49 (10th Cir. 2008) (courts may consider employment).

The government responds that because Mr. Jarvi failed to raise these issues adequately below, the district court did not need to consider them in any detail. Gov't Br. 33–35. We do not disagree. But because Mr. Jarvi may raise these grounds for mitigation during allocution, and "'[t]he sentencing judge must address the substance' of a defendant's nonfrivolous argument for a below-guidelines sentence," *United States v. Angel-Guzman*, 506 F.3d 1007, 1017 (10th Cir. 2007) (quoting *United States v. Traxler*, 477 F.3d 1243, 1250 (10th Cir. 2007)), it would be premature to address the relevance of these characteristics now.

## IV. CONCLUSION

The district court's denial of Mr. Jarvi's motion to suppress is **AFFIRMED**. We **REMAND** the case to district court with instructions to **VACATE** Mr. Jarvi's sentence and resentence him consistent with this opinion.