**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 23, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

DAVID GROSE,

      Defendant - Appellant.

No. 10-6277
(D.C. No. 5:09-CR-00191-F-1)
(W.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **HARTZ**, and **O'BRIEN**, Circuit Judges.

A jury convicted David Grose, formerly the chief financial officer (CFO) of a publicly traded company, of three counts of wire fraud for the unauthorized transfer of $1 million from company coffers for personal use. At sentencing, the district court determined Grose's relevant conduct included the unauthorized transfer of $10 million to the chief executive officer (CEO) of the company over a period of four years, Grose's receipt of over $800,000 in kickbacks from an equipment vendor, and the loss of over

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1. It is appropriate as it relates to law of the case, issue preclusion and claim preclusion. Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A). Citation to an order and judgment must be accompanied by an appropriate parenthetical notation – (unpublished). *Id.*

$95 million to shareholders associated with the public announcement of the CEO's misconduct. Grose was sentenced to sixteen years imprisonment based on losses of over $100 million to more than 250 victims and ordered to forfeit $1 million. On appeal, he challenges the district court's instructions to the jury, the prosecutor's cross-examination of his character witness, his sentence, and the forfeiture order. We affirm.

## I.   FACTUAL BACKGROUND

In 2004, Grose was hired as the CFO for the Quest entities in Oklahoma. These entities included Quest Resource Corporation and Quest Energy Partners L.P., both publicly traded companies, and Quest Midstream Partners L.P., a private corporation (collectively, "Quest").[1] Quest was involved in various aspects of gas and oil production. Although the charges in Grose's indictment were based solely on his unauthorized transfer of $1 million of Quest's funds, his sentence was also based on the $10 million in transfers he arranged for Cash and Grose's acceptance of kickbacks.

A.   The Offense of Conviction

In April 2008, Quest purchasing agent Brent Mueller was informed by a former business acquaintance, Ralph Ashley, that Ashley and two of his associates had a new product, a "hydrogen kit," which could be attached to vehicles to achieve significant gas economy. Ashley invited Quest representatives and representatives from other energy companies to view a demonstration of the product. Mueller and Grose attended the demonstration on behalf of Quest and were impressed. Shortly after the demonstration,

---

[1] The three companies were separate but utilized the same chief financial officer and chief executive officer.

Grose and Mueller approached Ashley to discuss making a personal investment in Ashley's new company, Oklahoma Hydrogen Gas Technologies (Hydrogen). Grose and Mueller eventually agreed they would invest $1 million for start-up costs in return for a share of Hydrogen's future profits. Grose agreed to personally provide the funding and told Mueller he planned to sell his stock in Quest to finance the purchase.

The two men reported their favorable assessment of the product to Jerry Cash, Quest's CEO. Cash authorized the purchase of ten hydrogen kits, at a cost of $42,000, to determine whether Quest would be interested in placing the device on its fleet of vehicles. Eventually only two devices were installed, one on Mueller's company vehicle and one on Grose's company vehicle.

Grose did not sell his Quest stock. Instead, at the end of June 2008, he had Mueller place an order for $1 million to Reliable Pipe & Equipment (Reliable) for the pipe Quest would need in 2009. Quest received Reliable's invoice on June 30, 2008. The same day, Mueller and Grose met with an attorney to prepare and file incorporation paperwork for a limited liability company, Affiliated Energy Partners (Affiliated Energy), in which Mueller and Grose were the only partners. In addition, they had the attorney draft a loan agreement between Affiliated Energy and Hydrogen for $1million.

On the morning of July 1, 2008, Grose wired the payment to Reliable. Before the payment had reached Reliable's bank account, however, Grose e-mailed Reliable and cancelled the order. He directed Reliable to re-wire the funds to Hydrogen rather than returning the money to Quest. The $1 million was transferred to Hydrogen the same day.

B.    Relevant Conduct

   1.    Money Transfers to Jerry Cash's Personal Account

   Shortly after Grose arrived at Quest in 2004, Cash and Grose agreed to transfer funds from the company to Cash's personal account established in the name of Rockport Energy Partnership (Rockport) and under his sole control.  According to Grose, Cash told him Rockport was a "scouting" organization for Quest and the transfers were authorized by the board.  (Vol. IV at 93.)  According to Cash, Grose told Cash the "line of credit" to his personal account was permissible and would not appear on the company's books as long as it was repaid prior to the close of the company's quarterly reports.  (Vol. IV at 66.)  At first, Cash timely repaid the money transferred to the Rockport account.  But by the fourth quarter of 2005, Cash's account did not have sufficient funds to repay the money he had borrowed.  To cover the shortfall, Cash wrote a check from his account to Quest and Grose entered the check in the company books as available cash.  However, Grose immediately transferred the funds back into Cash's account to cover the check. This arrangement continued until mid-2008.  At that point, Cash had "borrowed" over $10 million from Quest which he was unable to repay.  Neither Cash nor Grose informed any of the Quest board members what was occurring.

   2.    Kickbacks

   In late 2005, a Quest equipment and pipe supplier offered Grose and Mueller "an offer they couldn't refuse."  (Supp. App'x at 74.)  The vendor agreed to pay them one third each of the sales profits from his company.  Although the vendor never specifically told them the profits would be generated by sales to Quest, approximately 90% of the

- 4 -

vendor's pipe sales and 100% of its equipment sales were made to Quest. The payments continued until August 2008. Over that time, Grose received $849,670.56 in payments.

C.     Activities Discovered

Grose's financial manipulations began to unravel at the end of the first quarter of 2008. The April wire transfer from Quest returning funds to Cash's account was missing information. Because of the delay, the check from Cash to Quest was returned for insufficient funds. Although the problem was resolved a few days later, the transfers caught the eye of an outside auditor, David Mayfield, in July 2008.

In early July, Cash walked into Grose's office while Grose was on the telephone with Mayfield. Mayfield was inquiring into the purpose of the transfers. Grose explained the Rockport account was created to reserve funds for potential acquisitions in the event Quest did not want competitors to know it was entering a specific market. Mayfield told Grose the money needed to be returned to Quest and, if it was, he would not pursue the matter.

The transfer also came to the attention of Jack Collins, who went to work for Quest in December 2007. In July 2008, Collins was preparing a forecast for future operations of a newly acquired company which would need an infusion of capital. When Quest's cash balance appeared to be lower than it should be, Collins asked the assistant controller why this was so. The controller responded there was a consistent transfer of $10 million at the beginning of each quarter. Collins notified David Lawler, Quest's chief operating officer. On July 29, 2008, Lawler e-mailed Grose (copying Cash and several other Quest employees) to inform Grose he had learned Rockport was holding

$10 million belonging to Quest and the money should be returned for use by Quest for other projects. Cash responded the money would be returned.

Cash then disappeared for a few days. In the meantime, several board members had been approached by the Oklahoma Securities Department asking about the $10 million transfers. An emergency meeting of the board members of all three Quest entities was scheduled for August 22, 2008. The members determined Quest would demand Cash's resignation and Grose would be placed on administrative leave while the company conducted an internal investigation. On August 25, 2008, Quest issued a press release stating Cash had resigned, Grose had been placed on leave, and Lawler was the newly appointed CEO. The next day, Quest's stock price took a precipitous drop.

After the transfers to Cash were questioned and before he was placed on leave, Grose made several attempts to recoup the million dollars he had used to invest in Hydrogen. Direct requests to Ashley to repay the funds revealed the money had been spent by Hydrogen on start-up costs and unexpected problems with the product had prevented sales. Grose unsuccessfully tried to find substitute investors. After being placed on leave, Grose no longer had access to Quest's books.

During its year-end reconciliation, Quest discovered the paid invoice to Reliable but was unable to locate any pipe delivery. Jack Collins, Quest's interim CFO, called Reliable and was told that Grose had cancelled the order. Reliable provided Collins with a copy of Grose's e-mail instructing the transfer of the funds to Hydrogen. Collins attempted to telephone Hydrogen but the calls went unanswered. He then drove to Hydrogen's business address only to find another company was leasing the space and it

had no knowledge of Hydrogen. Collins eventually learned Hydrogen was no longer in business.

Quest terminated Grose's employment. An ensuing federal investigation later uncovered the vendor's kickbacks to Grose and Mueller from 2005 through 2008. At trial, Mueller testified he met with Grose while the Quest investigation was ongoing and Grose told him they should blame everything on Cash.

## II.    PROCEDURAL BACKGROUND

On June 16, 2009, Grose was indicted on three counts of wire fraud based on the transfer of Quest's funds to Reliable, the cancellation of the order, and Reliable's transfer of the funds to Hydrogen. A jury convicted him on all three counts. The presentence report (PSR) included the $10 million transfer to Cash and the kickback scheme as relevant conduct under USSG §1B1.3(a)(1)(2). It therefore calculated Grose's offense level under the 2009 version of the United States Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level  (USSG §2B1.1(a)(1)) | 7 |
| Total Loss (over $105.5 million) (USSG §2B1.1(b)(1)(N))[2] | +26 |
| Victims (more than 250) (USSG §2B1.1(b)(2)(C)) | + 6 |
| Violation of Securities Law (USSG §2B1.1(b)(17)(A)(i)) | + 4 |
| Obstruction of Justice (USSG §3C1.1) | + 2 |

---

[2] This amount reflects the $1 million transfer to Hydrogen as well as loss attributable to relevant conduct: (1) the $10 million transferred to Cash; and (2) $95.5 million in loss to Quest's shareholders; and (3) approximately $42,000 for the costs of the ten hydrogen kits; and (4) $886,000 in kickbacks. Because the $42,000 was without consequence to the guidelines loss enhancement, the court disregarded it for sentencing purposes.

Adjusted Offense Level                                                              45

(Vol. II at 18-19.)  With a criminal history category of I, the recommended guideline

sentence was life imprisonment.  However, the maximum penalty for each count in the

indictment was statutorily limited to 20 years.

Grose objected to the PSR's loss calculations.  He argued the $10 million transfers

to Cash were not related to the $1 million transfer to Hydrogen.  He claimed Cash had

told him the transfers were authorized and therefore any loss to Quest was solely through

Cash's actions.  Similarly, Grose claimed the kickbacks were not related to his offense

conduct and there was no evidence Quest paid a higher-than-market price to the vendor

or that the vendor would not have otherwise received Quest's business.  Therefore, the

amount of loss should have been limited to the $1 million, which called for a 14-level

enhancement (rather than a 26-level enhancement) under the guidelines.  Grose also

objected to the number of victims and the obstruction of justice enhancements as well.

As a result, Grose maintains the guideline range for imprisonment should have been 37 to

46 months.

The evidentiary portion of Grose's sentencing hearing was held in conjunction

with Cash's.[3]  At the hearing, Cash testified he told Grose his business ventures outside

of Quest were missing opportunities due to lack of funds.  In response, Grose suggested

the "line of credit" scheme.  According to Cash, Grose was fully aware that there was no

board authority to make the transfers and knew there was no money to repay the funds by

_____

[3] Cash pled guilty after reaching a plea agreement with the government and was
sentenced to nine years imprisonment.

- 8 -

2007.  Nonetheless, both Cash and Grose signed certifications of Quest's financial reports every quarter.

The government presented expert testimony on the loss associated with the decrease in Quest's stock value due to its announcement of the change in management. Cash presented opposing expert testimony which Grose adopted.

The court sentenced Grose on November 29, 2010.  It determined Grose's assistance to Cash in taking $10 million and his receipt of kickbacks were relevant conduct to his offense of conviction:

> Judging Mr. Grose's faithless acts between the fall of 2005 and the summer of 2008 . . . there is no room for doubt that they were of a piece.  They certainly were part of the same course of conduct.  They had common victims; they all involved the violation of the same duties owed to the same victims; they had a common purpose of illicit and surreptitious enrichment; and they were all part and parcel of a protracted and remarkably repetitious series of frauds.

(Vol. IV at 560.)  The court, however, imposed a sentence lower than the guidelines' recommendation.  Grose was sentenced to sixteen years imprisonment on each count of conviction to run concurrently and ordered to forfeit $1 million.

### III.    DISCUSSION

A.    Trial

Grose raises two trial issues:  (1) the court erred in failing to give the proper instruction on the defense theory of good faith; and (2) over his objection, the court allowed the government to improperly question Grose's character witness.

1.    Jury Instructions

Grose's defense, as explained by his counsel in opening and closing statements,[4] was that Cash would not let Grose sell his stock to make a personal investment in Hydrogen. Instead, Cash told Grose he wanted Quest to make the investment because he wanted to "be out in front" of a competitor's efforts to "go green." (Vol. III at 98.) Cash told Grose he did not want anyone to be aware of this investment because Quest was in the middle of significant business negotiations with the competitor and Cash was concerned the investment would affect the negotiations. Therefore, according to Grose, Cash told him to proceed as if it were a personal investment. Cash also directed the cancellation of the pipe order to Reliable and instructed Grose to have it send the payment to Hydrogen. According to Grose, his actions were merely done in compliance with Cash's orders and he had no intent to defraud or harm the company in any way.

Grose submitted a proposed jury instruction stating in relevant part:

The Defendant David Grose . . . contends that he is not guilty of the crimes charged because of his good faith reliance on the directives of his direct supervisor, the Chief Executive Officer of Quest.

The "good faith" of Defendant David Grose is a complete defense to the charges of the indictment because good faith on the part of Mr. Grose is simply inconsistent with the knowing intent to defraud alleged in each count of the indictment.

A person who acts, or causes another person to act, on a belief or opinion honestly held is not punishable under these statutes merely because the belief or opinion turns out to be inaccurate, incorrect, or wrong. An honest mistake in judgment or an honest error in management does not rise to the level of criminal conduct.

_____

[4] Grose did not testify at trial.

- 10 -

(Vol. I at 23.)  The court refused to give the instruction saying, "[T]he defendant is entitled to argue the intent issue in every way that may be supported by the evidence, but with the case going to the jury on the basis of the record as it now stands,  . . . the premise [for the proposed] wire fraud instruction is insufficient to warrant giving separate treatment of the good faith issue."  (Vol. III at 478.)  Instead, the court instructed the jury as follows:

> To find the defendant guilty of a crime charged in the indictment, you must be convinced that the government has proved each of the following beyond a reasonable doubt, with respect to each crime charged in each separate count of the indictment:
>
> FIRST:  That the defendant knowingly devised or intended to devise a scheme to defraud or to obtain money or property by means of false or fraudulent pretenses, representations or promises;
>
> SECOND:  That the defendant acted with specific intent to defraud or to obtain money or property by means of false pretenses, representations or promises;
>
> THIRD:  That the defendant used interstate or foreign wire communications . . . .
>
> FOURTH:  That the scheme employed false or fraudulent pretenses, representations, or promises that were material.

(Vol. I at 64.)  The instruction defined "an intent to defraud or to obtain money by false pretenses, representations or promises" as "an intent to deceive or cheat someone."  (Vol. I at 65.)  It did not, however, define the term "knowingly."  Grose argues that, absent his proposed language or a definition of the term "knowingly," the jury was inadequately instructed on his theory of defense.

"We review instructions as a whole to determine whether they accurately informed the jury of the governing law" and review the district court's "refusal to give a requested

instruction under this standard for an abuse of discretion." *United States v. Bowling,* 619 F.3d 1175, 1183-84 (10th Cir. 2010). "While a defendant is entitled to an instruction on his theory of defense where some evidence and the law supports the theory," "a theory of defense instruction is required only if, without the instruction, the district court's instructions were erroneous or inadequate." *Id.* (quotations omitted). "[S]uch an instruction is not required if it would simply give the jury a clearer understanding of the issues." *Id.* at 1184 (quotations omitted).

A specific good faith instruction is justified when a defendant has presented evidence capable of rebutting "all evidence of false and misleading conduct, all failures to disclose that which should have been disclosed and all matters that deceive and were intended to deceive another." *United States v. Chavis*, 461 F.3d 1201, 1209 (10th Cir. 2006) (quotations omitted). But "a separate good faith instruction is no[t] necessary where a district court properly instructs the jury on the element of intent, because a finding of the intent to defraud necessarily implies that there was no good faith." *Bowling*, 619 F.3d at 1183 (quotations and citation omitted).

Grose claims he presented "some" evidence to warrant his proposed instruction. The district court disagreed. While we see no problem with the court's conclusion, we need not address Grose's evidence, or lack thereof. Even if Grose had presented sufficient evidence to show some support for his defense theory, the instructions given were adequate to fully inform the jury of the elements of the charges and the necessity of finding a lack of good faith in order to convict.

The instructions here made it quite clear that the jury must find, beyond a

reasonable doubt, that the government proved Grose "knowingly devised or intended to devise a scheme" "to deceive or cheat someone." (Vol. I at 64-65.) If the jury believed Grose was only acting at Cash's direction – and he believed it was appropriate to use the company's funds in this manner – then, under the court's instructions, it could not find he had the intent to defraud.

Grose maintains the court's failure to define the term "knowingly" left the jury unaware that the act must be intentional and not due to mistake or accident. He further argues the jury should have heard from the court that if he mistakenly believed Cash had the authority to direct him to take the actions at issue, he must be exonerated. This argument is without merit. There was no evidence before the jury that Grose, an experienced CFO of publicly traded companies, misunderstood the prohibition against Cash's receipt of Quest's resources for his personal use. And the instructions clearly state Grose must have acted with specific intent to defraud which, by its very nature, cannot be a mistake. The district court completely and adequately instructed the jury on Grose's theory of defense.

2.      Hypothetical Questions Posed to Character Witness

The government called Roger Brooks, Reliable's owner, to testify regarding the wire transactions on June 30 and July 1, 2008. During cross-examination, defense counsel asked Brooks about his opinion of Grose's character. Brooks replied he considered Grose to be "an honest gentleman" and he "would do business" with him. (Vol. III at 265-66.) On redirect, the government asked Brooks four questions relating to his opinion. First, Brooks was asked if he was aware that the Securities and Exchange

Commission had charged Grose with defrauding Quest shareholders. Brooks answered he was not aware of the charges and he would need to know the facts to determine whether his opinion of Grose would change. Brooks was then asked, "Would your opinion change if you found out that the defendant wired a million dollars out of Quest without the knowledge or permission of the board of directors?" (*Id.* at 277.) Defense counsel objected but the court allowed the question, instructing the jury it was subject to the government's ability to prove the premise for the question. Brooks answered, if that was true, it would "very likely" change his opinion. (*Id.*) The government asked two more questions:

> Would your opinion of the defendant change if you found out that he set up that million dollar wire so it looked like he was trying to wire money to pay for an order of pipe when in fact he was sending the money to another company?
>
> . . . .
>
> Would your opinion of the defendant change if you found out that he tried to get one of his employees to lie about the million dollar wire?

(*Id.* at 278.) Counsel did not object to these questions and Brooks' answers were equivocal. Grose contends it was prejudicial error to permit the government to propound questions which assumed, as a fact, that he was guilty of the very offenses for which he was then on trial.

"We review the district court's decision to allow cross-examination questions of character witnesses for abuse of discretion." *United States v. Parker*, 553 F.3d 1309, 1320 (10th Cir. 2009). However, because Grose failed to object to three of the four questions he claims were error, we review those questions for plain error. *See* Fed. R.

- 14 -

Crim. P. 52(b). Under plain error review, we reversed only if "there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Randall*, 661 F.3d 1291, 1296 (10th Cir. 2011) (quotations omitted). The propriety of "character evidence depend[s] on numerous and subtle considerations difficult to detect or appraise from a cold record, and therefore rarely and only on clear showing of prejudicial abuse of discretion will [we] disturb rulings of trial courts on this subject." *Parker*, 553 F.3d at 1320 (quoting *Michelson v. United States*, 335 U.S. 469, 480 (1948)).

Under Rule 405 of the Federal Rules of Evidence, a defendant may elicit testimony of his good character, if relevant, and the prosecution may conduct limited cross-examination. Grose relies on *United States v. Polsinelli,* where we held the admission of a hypothetical question assuming the guilt of the defendant during the cross examination of two character witnesses was reversible error. 649 F.2d 793, 797-98 (10th Cir. 1981). The government argues Grose's reliance on *Polsinelli* is misplaced because the question here requested a personal opinion of his character, whereas *Polsinelli* involved questions as to the defendant's reputation in the community. According to the government, our holding in *United States v. Parker* governs. 553 F.3d 1309 (10th Cir. 2009).

In *Polsinelli*, the defendant was charged with two counts of distributing an ounce of cocaine. *See* 649 F.2d at 794. The prosecutor asked the defendant's character witnesses whether their estimation of the defendant's reputation in the community would change if they became aware that Polsinelli had, on at least two occasions, distributed

ounce quantities of cocaine. *Id*. at 794-95. We distinguished two different types of character testimony – (1) testimony as to the defendant's reputation in the community or (2) the witness's personal opinion of the defendant's character. *Id*. at 796. Because the prosecutor's question asked the witness to speculate on how the defendant's reputation in the community would change if his guilt were assumed, we concluded the district court erred in allowing these questions. *Id*. at 797.

Generally, if the witness is testifying regarding the defendant's reputation in the community, hypothetical questions assuming the guilt of the defendant are not permitted for two reasons. First, the witness is speaking to the *community's* assessment of the defendant. Therefore, a question asking if knowledge of certain facts would change that reputation calls for speculation rather than personal knowledge. *Id*. at 796 (citing with approval *United States v. Candelaria-Gonzalez*, 547 F.2d 291, 294 (5th Cir. 1977) ("[T]he questions posed sought speculative responses resting upon an assumption of guilt.")). Second, hypothetical questions assuming guilt "str[ike] at the very heart of the presumption of innocence which is fundamental to Anglo-Saxon concepts of fair trial." *Id*. at 796 (citation omitted). "[A]s in all criminal cases, the accused [is] presumed to be innocent, and this presumption attend[s] him throughout the trial, as a matter of evidence, or until overcome by evidence sufficient to satisfy the jury of his guilt beyond a reasonable doubt and to a moral certainty." *Id*. at 797 (quoting *Chiles v. State*, 159 So. 700, 702 (Ala. Ct. App. 1935)). "Since character evidence is admitted only as bearing upon guilt or innocence, an opinion based upon the assumption that the defendant is guilty cannot have any probative value in deciding that issue." *Id*. at 797 (quoting with

- 16 -

favor *United States v. Morgan*, 554 F.2d 31, 34 (2nd Cir. 1977) (Mansfield, J., concurring)).

In contrast, in *Parker* we considered "questions of the 'have you heard' variety" as they relate to a witness's personal opinion of the defendant's character. 553 F.3d at 1320. Parker was charged with a scheme to sell defective aircraft parts. He conceded he sold the parts, but claimed he had no knowledge of the defects and therefore lacked the requisite intent. *Id*. at 1313. At trial, he sponsored a personal-opinion character witness. *Id.* at 1320. Over the defendant's objection, the government asked whether the witness's opinion would change "if [he] found out [the defendant] had been selling aircraft engines . . . that were unairworthy" or if that, after learning the parts were "bad[,] . . . [the defendant] did not then go ahead and contact the other purchasers of the engines to warn them that they might have a defective engine?" *Id*. We affirmed the district court's ruling, even though the line of questioning related to the same bad acts at issue in the case. *See id*. at 1319-21, 1326.

We explained "questions of the 'have you heard' variety [are allowed] when a character witness testifies about [his or her] personal opinion of the defendant's character, as opposed to offering testimony limited to defendant's general reputation in the community." *Id*. at 1320 (citing *Polsinelli*, 649 F.2d at 795-96). For example, "[t]he prosecution may ask a personal opinion witness whether he or she 'has heard' the defendant had been sued for fraud and whether that information 'would have affected

your opinion' of good character."[5]  *Id*.  Since the questions did not presume conviction, they were proper.

The first two questions propounded to the witness here were nearly identical to those in *Parker*.[6]  As in *Parker*, the facts on which the questions were premised were uncontroverted or had been admitted in Grose's counsel's opening argument.  (Vol. III at 95-96, 100-01)  It was Grose's intent which was at issue – whether Cash told him to make the initial payment to Reliable, cancel it and send it to Hydrogen or whether he did it on his own.  Because the questions did not assume intent, guilt was not assumed.  *Id*. at 1320; *see also United States v. Wilson*, 983 F.2d 221, 224 (11th Cir. 1993) ("Wilson already had admitted during his time on the stand:  he sold credit card numbers to an undercover Secret Service agent.  Wilson had denied any fraudulent intent.  The questions attributed no intent to him.").

The third question, however, at the least teeters on the edge of propriety ("[Grose] he set up that million dollar wire so it looked like . . ."); the opening statement did not admit Grose planned the change in the wire transfer from Reliable to Hydrogen.  And the prosecutor's fourth question – assuming Grose told another employee to lie about the

---

[5] The government also cites to the one circuit, the District of Columbia, which has held guilt-assuming hypotheticals may be permissible where the witness gives a personal opinion of the defendant's character.  *See United States v. White*, 887 F.2d 267, 274-75 (D.C. Cir. 1989).  We did not go so far in *Parker* and do not do so here.

[6] In *Polsinelli*,we carefully explained we "d[id] not intend to imply that such cross-examination would have been proper had the character witnesses expressed their personal opinion of Polsinelli's character.  Resolution of that particular matter must await a different fact situation."  649 F.2d at 799.  *Parker* neither expanded nor constrained our decision in *Polsinelli*.

transfer – clearly went beyond any facts admitted in defense counsel's opening statement. These questions could fairly be characterized as assuming Grose's intent to commit wire fraud. However, Grose makes no effort to show plain error.[7]

Even assuming Grose could meet the first and second prongs of plain error, *see United States v. Thornburgh*, 645 F.3d 1197, 1209 (10th Cir.), *cert. denied*, 132 S. Ct. 214 (2011) ("error cannot be *plain,* in view of the widely differing interpretations"), he has not alleged or argued that any error by the district court affected his substantial rights. "For an error to have affected substantial rights, 'the error must have been prejudicial: It must have affected the outcome of the district court proceedings.' " *United States v. Trujillo-Terrazas,* 405 F.3d 814, 819 (10th Cir.2005) (quoting *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). It is Grose's burden to show his substantial rights have been prejudiced, *id.,* and we will not supply his argument for him. *See United States v. Romano*, 491 F.3d 1173, 1179 (10th Cir. 2007); *see also Salehpoor v. Shahinpoor,* 358 F.3d 782, 785 (10th Cir. 2004) (holding that "[w]e will not manufacture a party's argument on appeal when it has failed in its burden to draw our attention to the error below."). Grose's claim that the court reversibly erred in admitting

---

[7] Instead, Grose claims he was excused from objecting because it would have been futile. "The "futility" exception applies when "the district court is aware of the party's position and it is plain that further objection would be futile, where [the] litigant's position [was] clearly made to the district court." *Abuan v. Level 3 Commc'ns,* 353 F.3d 1158, 1172 (10th Cir. 2003) (quotations omitted). "[T]he rule has application in any context where it is absolutely clear an objection would have been futile." *United States v. Algarate-Valencia*, 550 F.3d 1238, 1243 (10th Cir. 2008). As discussed above, the one question Grose objected to was not improper. Therefore, to say further objection to an improper question would have met the same fate rests entirely on speculation. Grose was not excused from further objection.

the prosecutor's question must fail.

B.    Sentencing

As to sentencing, Grose claims the district court erred in calculating the guidelines range when it: (1) included the $10 million transfers to Cash and Grose's receipt of kickbacks as relevant conduct; (2) calculated the number of victims; (3) applied an enhancement for obstruction of justice; and (4) refused to consider the results of a polygraph examination submitted by Grose in his allocution. He further challenges the $1 million forfeiture order.

We review sentences for reasonableness, as informed by the 18 U.S.C. § 3553(a) sentencing factors. *See, e.g., United States v. Munoz–Tello,* 531 F.3d 1174, 1181 (10th Cir. 2008). "Reasonableness review has a procedural and substantive component." *United States v. Martinez,* 610 F.3d 1216, 1223 (10th Cir.), *cert. denied*, 131 S. Ct. 543 (2010). Procedural reasonableness focuses on whether the district court erred in "calculating or explaining the sentence." *United States v. Friedman,* 554 F.3d 1301, 1307 (10th Cir. 2009). Substantive reasonableness focuses on whether the length of the sentence is reasonable in light of the factors contained in 18 U.S.C. § 3553(a). *Id.* "When evaluating the district court's interpretation and application of the Sentencing Guidelines, we review legal questions *de novo* and factual findings for clear error, giving due deference to the district court's application of the [G]uidelines to the facts." *Munoz-Tello*, 531 F.3d at 1181 (internal quotation marks omitted). In other words, "[w]e review the district court's factual finding supporting a determination of relevant conduct for clear error but review the ultimate determination of relevant conduct de novo." *United States*

- 20 -

*v. Caldwell,* 585 F.3d 1347, 1349–50 (10th Cir. 2009) (quotation omitted). Grose challenges both the procedural and substantive reasonableness of his sentence.

### 1.    Procedural Reasonableness

Grose maintains the district court procedurally erred in numerous ways when calculating his guideline sentence because his offense of conviction was a $1 million wire fraud and no other conduct was relevant to this offense or proved by the government. *See Gall v. United States,* 552 U.S. 38 (2007) (describing procedural errors "such as failing to calculate (or improperly calculating) the Guidelines range" and "selecting a sentence based on clearly erroneous facts"). He argues Cash's crimes (with the resulting number of victims and loss to shareholders) were not sufficiently connected to the wire fraud to constitute relevant conduct and, further, the evidence at sentencing was insufficient to establish his knowledge that the transfers to Cash were unauthorized. In a similar vein, he claims the court erroneously included the kickbacks as relevant conduct and the government did not establish his receipt of this money was a crime. He contends the enhancement for obstruction of justice was also error. Finally, he says the court reversibly erred in failing to consider the results of the polygraph exam at his sentencing allocution.

*Cash's Embezzlement and Loss to 250 Shareholders*

Under USSG §3D1.2(d), the $10 million transfer to Cash, had Grose been convicted of that crime, would have been grouped with his conviction for the $1 million wire fraud for sentencing purposes. Therefore, the transfer to Cash is relevant conduct if it was "part of the same course of conduct or common scheme or plan as the offense of

- 21 -

conviction . . . ." *See* USSG §1B1.3(a)(2). A "'[c]ommon scheme or plan' and same 'course of conduct' are two closely related concepts." USSG §1B1.3, comment. (n.9). "For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose or similar <u>modus operandi</u>." *Id*. at (n.9(A)).

> The district court determined the $10 million transfer was relevant conduct:

> Mr. Grose was Quest's chief financial officer charged with protecting Quest's financial assets and assuring Quest's financial integrity. He was also Quest's compliance officer charged with enforcing Quest's corporate code of ethics, and by implication, at least, with the obligation to conduct himself as an exemplar of ethical conduct as an officer and employee of publicly traded companies . . . .

(Vol. IV at 558-59.) The court noted the overlapping time period, the common victims and the common purpose of Grose's conduct and concluded all the events constituted a common scheme or plan.

Grose claims "Cash's 'loans' from Quest that he put to personal use were completely unrelated to Mr. Grose's offenses of conviction." (Appellant Br. at 38.) He notes the district court did not allow evidence of the $10 million embezzlement during trial because it was inadmissible under Federal Rule of Evidence 404(b) and, if it had actually been "part of a single criminal episode" it would not have been subject to Rule 404(b)." *United States v. Irving*, 665 F.3d 1184 (10th Cir. 2011) (quotations omitted). But Grose misapplies the court's trial ruling. Whether Grose's scheme with Cash was *intrinsic* to his unauthorized transfer to Hydrogen – the question of admissibility at trial –

is not the question at sentencing.

In defining "same course of conduct" under USSG §1B1.3(a)(2):

The term looks to whether the defendant repeats the same type of criminal activity over time. It does not require that acts be connected together by common participants or by an overall scheme. It focuses instead on whether defendant has engaged in an identifiable behavior pattern of specified criminal activity.

*United States v. Hamilton*, 587 F.3d 1199, 1221 (10th Cir. 2009) (quotations omitted).

Grose argues the only commonality between Cash's "loans" and Grose's transfer of funds to Hydrogen is that he processed wire transfers from Quest funds while employed by Quest. In addition, because the temporal proximity of his actions covers such a broad time span, it has no legal significance. We disagree.

Grose's choice to defraud his employer during his entire tenure with Quest is highly significant in determining his sentence. During that time the victim, Quest and its shareholders, remained the same. Grose used his access and control of company finances to carry out both schemes and attempted to conceal his series of frauds by the same method. The court did not err in determining relevant conduct.

Grose's sole attack on the inclusion of the $73 million fall in Quest's stock price is that the stock crash was attributable only to Cash, and not Grose. Significantly, he has not contested the method used to calculate the stock loss, or whether it was a "reasonably foreseeable" result of Cash's embezzlement. *See* § 2B1.1 cmt. 3(A)(i). His attack on the number of victims enhancement is similarly limited. But the law is clear that "actual loss" encompasses losses from the defendant's crimes as well as any relevant conduct, *see United States v. Griffith*, 584 F.3d 1004, 1011 (10th Cir. 2009), and that anyone who

suffers any "actual loss" is a victim, *see* § 2B1.1 cmt. 1. Thus, given Grose's limited challenge to these enhancements and our conclusion that Grose's involvement in Cash's fraud qualifies as "relevant conduct," we see no basis for overturning the district court's imposition of those enhancements.

In the alternative, Grose contends there was insufficient evidence to establish he knew that the transfers to Cash were unauthorized. He argues the evidence showed Cash's assistant and the Quest assistant controller were also aware of the transfers; the capital swap had been audited each quarter; he received no personal gain from the transfers; and Grose believed Cash's assurances he had cleared the arrangement with the Board. Grose acknowledges Cash's testimony at sentencing that the transfers were Grose's idea and, without Grose's involvement, the fraud could not be completed. However, he insists Cash's testimony was inherently unreliable and, without more, there was no evidence Grose knew more than any other employee.

It is not our place to second-guess the reliability of Cash's testimony. *See United States v. Hanson*, 543 F.3d 1315,1319 (10th Cir. 2008) (quotations omitted) ("The sentencing court has discretion to make credibility determinations for sentencing purposes and we decline to review the credibility of a witness' testimony on appeal."). The district court obviously believed Cash's version of Grose's involvement. The record sufficiently supports the court's conclusion that the $10 million loss to Quest and the resulting drop in the value of Quest's stock immediately after the public was informed of the fraud was caused in large part by Grose's relevant conduct.

*Kickbacks*

Grose also claims the district court erred in concluding his receipt of kickbacks was relevant conduct. He also argues the government never alleged or offered evidence that this activity was a criminal violation. Rather, the government characterized this activity as a violation of Quest's ethical code. This argument deserves short shrift. There was more than sufficient evidence establishing a violation of the federal law prohibiting the breach of a fiduciary duty through bribes or kickbacks, done with the intent to defraud, and involving interstate wires. *See* 18 U.S.C. § 1346; *Skilling v. United States*, 130 S. Ct. 2896, 2933 (2010) ("Interpreted to encompass only bribery and kickback schemes, § 1346 is not unconstitutionally vague."). The record shows Grose took kickbacks, he did so with intent to defraud, and Quest's interactions with the equipment supplier routinely involved the use of interstate wires. And, as discussed above, the receipt of kickbacks was just another part of Grose's ongoing betrayals of his fiduciary duty to Quest and its shareholders.

*Obstruction of Justice Enhancement*

Grose claims the district court erred in imposing an obstruction of justice enhancement under USSG §3C1.1. That section provides:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing **of the instant offense of conviction**, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels. (emphasis added).

He argues that any false statements he may have made to the SEC during its investigation

of Cash's misconduct were not part of the investigation of the $1 million misappropriation for which he was convicted.  Rather, at the time he made his statements to the SEC, the $1 million transaction had not yet been discovered.  Thus, his false statements were not made to obstruct the investigation of his offense of conviction.  This guideline, however, is not construed so strictly.  "U.S.S.G. § 3C1.1 applies not only to the defendant's obstructive conduct involving his offense of conviction, but also to any of his obstructive conduct involving cases that are closely related to the defendant's case." *United States v. Mollner*, 643 F.3d 713, 716 (10th Cir. 2011).

Even if we were to adopt Grose's reading of this section, his argument still fails. The district court found, in relevant part:

> Mr. Grose made several materially false statements to the SEC in his interview on September 29, 2008 . . . .  Ignoring other statements that were likely false, but might be debatable on the basis of the record now before the Court, I find that Mr. Grose made a false statement to the SEC when he told the SEC, in substance, that the company he had formed with Mr. Mueller was not yet active and was looking for future opportunities.  At that point, the $1 million misappropriation had not been discovered and Mr. Grose wanted it to stay that way.

(Vol. IV at 584.)   As noted in the guideline commentary, "[o]bstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction."  USSG §3C1.1 comment. (n.1).

The district court determined Grose's false statements were calculated to avoid the discovery of his $1 million misappropriation.  This finding is fully supported by the

record. The court did not err in applying the enhancement.

*Allocution*

Sentencing occurred in two phases. First, an evidentiary hearing was held for both Cash and Grose. One week later, each defendant was sentenced individually. Just prior to second stage in Grose's sentencing, defense counsel announced:

> Your honor, as I previously advised the Court last week, on Tuesday, [Grose] went down to Houston, Texas, and met with his appellate counsel down there to discuss matters and it was decided by counsel that he should obtain a polygraph examination, which he took on November 24, relating to the facts of the case and certain relevant conduct in this case.
>
> I have in my hand a report of that examination, which he passed the examination, and I was asked by appellate counsel to offer this as an exhibit for sentencing purposes and any other purpose that might be – it might be used for in this regard, to include appellate purposes.

(Vol. IV at 543.) Counsel offered the exhibit into evidence. The government objected because it: (1) attacked the jury's verdict; (2) it was offered well beyond the time set by the court for taking evidence; and (3) the guidelines require evidence be deemed reliable before considering it at sentencing and there was no showing of reliability. The court determined the exhibit would be excluded "for all purposes" for the reasons stated by the government. (*Id*. at 545.) Grose made no objection. Grose now claims the district court's refusal to consider the polygraph violates his right to allocution.[8]

---

[8] Although we have not officially announced our standard of review when considering an allocution challenge, our cases imply we will review such a challenge de novo. *See United States v. Landeros-Lopez*, 615 F.3d 1260, 1264 n.4 (10th Cir. 2010). However, we recently held "that a defendant who fails to object to the district court's procedures regarding the right of allocution must demonstrate plain error to warrant reversal on appeal." *United States v. Rausch*, 638 F.3d 1296, 1300 n.1 (10th Cir. 2011). Grose argues this standard should not apply to him because his sentencing occurred

- 27 -

Rule 32(i)(4)(A) of the Federal Rules of Criminal Procedure requires the district court, before imposing sentence, to:

> (i) provide the defendant's attorney an opportunity to speak on the defendant's behalf;
>
> (ii) address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence; and
>
> (iii) provide an attorney for the government an opportunity to speak equivalent to that of the defendant's attorney.

The court complied with the rule. As Grose acknowledges, his attorney read his detailed statement into the record. The court also directly asked Grose if he wanted to say anything else on the record before he was sentenced. Grose declined.

Relying on *United States v. Jarvi*, 537 F.3d 1256 (10th Cir. 2008), Grose claims the court denied him his right to speak when it refused to consider the polygraph report. In *Jarvi*, the defendant filed *pro se* objections at sentencing to the quantity of drugs applied in calculating his sentence. 537 F.3d at 1259. The district court refused to consider them, even though it had not previously ruled on his argument, because Jarvi was represented by counsel. *Id*. We remanded for resentencing stating, "when it comes to allocution, the defendant has a broad right to present *any* information to mitigate the sentence . . ., and that right is not forfeited by the defendant's unjustified attempt to present the information earlier in a different form." *Id*. at 1262.

We distinguished our precedent found in *United States v. Muniz,* 1 F.3d 1018

_____

before *Rausch* and *Rausch* can be distinguished as it concerned allocution in a revocation proceeding rather than an original sentencing. We need not decide whether Grose's failure to object requires a plain error analysis because we see no error under any standard.

(10th Cir. 1993). *Jarvie*, 537 F.3d at 1267. In *Muniz*, we held the right of allocution was not violated when the court told the defendant at sentencing not to reargue a Sixth Amendment speedy trial issue that had already been extensively litigated. *Muniz*, 1 F.3d at 1025 ("The judge did not unfairly prevent Muniz from speaking because the judge does not have to let the defendant re-argue the case at sentencing."). We concluded *Muniz* was inapplicable for two reasons: (1) Jarvi was not "making arguments about supposed violations of his rights at trial," and (2) he was not attempting to "*re*-argu[e] claims that had already been raised and ruled on." *Jarvi*, 537 F.3d at 1262.

We find Grose's situation indistinguishable from that of the defendant in *Muniz*. The polygraph examiner's report described the "examination criteria" as follows:

> The following relevant questions were asked of the subject. The subject's verbal response follows each question in quotation marks.
>
> 1. DID YOU DIRECT RELIABLE PIPE TO SEND THE MONEY TO THE HYDROGEN COMPANY WITHOUT JERRY CASH'S AUTHORIZATION? "NO"
>
> 2. DID YOU LIE WHEN YOU SAID JERRY CASH DIRECTED YOU TO INVEST THE MONEY ON BEHALF OF QUEST? "NO"
>
> 3. DID YOU USE QUESTS [sic] MONEY FOR A PERSONAL INVESTMENT? "NO"

(Vol. I at 349-50.) The examiner reported: "After careful examination of the subject's polygrams, it is my professional opinion that there were **No Deceptive Criteria** present. The subject is considered to be **truthful** as the listed relevant questions were answered." (*Id*. at 350.)

The polygraph report is, quite simply, an attempt to refute the jury's verdict. The court did not err in refusing to consider these statements. Moreover, the polygraph report

duplicated Grose's written statement.[9]  The only difference was the polygraph examiner's

*imprimatur* that Grose's answers were considered to be truthful.  Because the issues

addressed by the examiner had already been argued at trial and rejected by the jury, the

court did not err in refusing to consider this evidence.

Grose argues the polygraph report also affected the court's evaluation of Cash's

credibility in respect to Grose's involvement in the $10 million transaction.  But the

questions posed by the polygraph examiner did not address that transaction.  The court

did not err in refusing to consider this information to establish Grose's credibility.[10]

2.     Substantive Reasonableness

Grose claims the sixteen-year term of imprisonment is substantively unreasonable

given Grose's formerly unblemished history as a financial officer and Cash's nine-year

sentence.  "A sentence is substantively unreasonable if the length of the sentence is

unreasonable given the totality of the circumstances in light of the 18 U.S.C. § 3553(a)

factors."  *United States v. Haley*, 529 F.3d 1308, 1311 (10th Cir. 2008).  We apply an

---

[9] Grose had his attorney read a statement denying any wrongdoing and claiming he believed Cash was using the $10 million on behalf of Quest and he had transferred the $1 million at Cash's request believing it to be a Quest investment.  He claimed Cash and Mueller lied during their testimony to remove the blame from themselves.

[10]  Further, Grose made no attempt to establish the reliability of the polygraph. *See* USSG §6A1.3(a) (A sentencing court "may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information *has sufficient indicia of reliability to support its probable accuracy*.") (emphasis added).  He offered only the unadorned report.  Although the document contains the examiner's state license number, there is no other information as to the circumstances under which the test was given or whether the three questions contained in the report were the entirety of the examination.  In other words, the court was not provided any indicia of the test's reliability.

abuse-of-discretion standard where we will affirm the sentence unless it "is arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. Steele*, 603 F.3d 803, 809 (10th Cir. 2010). "[D]isparate sentences are allowed where the disparity is explicable by the facts on the record." *Haley*, 529 F.3d at 1312 (quotations omitted).

Grose's offenses were subject to a statutory maximum of 60 years. Mindful of the Congressional intent behind the policies for sentencing fraud on a public company, the district court nonetheless determined Grose was entitled to a "significant downward variance." (R. Vol. IV at 609.) However, the court determined there was a need for a substantial term of incarceration:

> Mr. Grose, your career as a financial executive or at least as a trusted employee with finance-related responsibilities goes back 30 years or more.
>
> When you came to Quest, you were not a neophyte with respect to the obligations of a chief financial officer in general or with respect to the importance of compliance with securities laws and audit requirements.
>
> As to these matters, Jerry Cash had some plausible claim to naivety, although he clearly knew that his misappropriation of $10 million was wrong.
>
> You have no such claim to naivety. You do have a plausible argument that you intended to pay back the $1 million that you and Mr. Mueller took. And you and Jerry Cash do have at least a semblance of an argument that he, Mr. Cash, intended to repay the $10 million that he took with your help, however attenuated that possibility might have been as a practical matter.
>
> But the $850,000 in kickbacks that you took in approximately 80 transactions is perhaps the most telling aspect of this case. There is no way – simply no way that the CFO of a publicly traded company can put a presentable face on his receipt of $850,000 in kickbacks.
>
> During the 34 months that you were taking these kickbacks, you were essentially using your position as the chief financial officer of a publicly held company to steal with both hands.

> Whatever your subjective rationale may have been, you have no claim to anything other than a purely larcenous intent. Your belated account in this courtroom today of your felonious conduct is unbelievable in almost every particular and is, to put it mildly, wholly unpersuasive.

(Vol. IV at 610-11.) After considering the § 3553(a) factors, the court sentenced Grose to sixteen years imprisonment.

Because Cash took total responsibility for his actions and had made significant efforts to repay Quest the money he had taken, while Grose continued to deny any responsibility for any criminal conduct after his conviction, we find no abuse of discretion in the disparity between their sentences (Cash's nine years as opposed to Grose's sixteen-year imprisonment). Similarly, we find no abuse of discretion in the district court's application of the §3553(a) factors given the facts of this case. Grose's relevant conduct constituted a prolonged series of frauds upon his employer and its shareholders. His persistent claim of innocent intent demonstrates an apparent lack of remorse. The district court's sentence is substantively reasonable.

3.      Forfeiture

The indictment charging Grose with three counts of wire fraud included forfeiture allegations:

> Upon conviction of any of the offenses alleged in Counts 1 through 3 of the indictment, defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property constituting or derived from proceeds traceable to said offenses, including, but not limited to, a sum of money equal to $1,000,000.00, representing the amount of cash proceeds obtained as a result of the offenses.

(Vol. I at 18.) Following Grose's conviction, the government moved for a preliminary order of forfeiture for a $1 million personal money judgment. Grose objected for three

- 32 -

reasons: (1) improper notice of sufficient grounds for forfeiture; (2) violation of his right to have a jury decide forfeiture issues under Fed. R. Crim. P. 32.2 and *United States v. Booker*, 543 U.S. 220 (2005); and (3) insufficient evidence. The district court rejected Grose's objections and entered a preliminary order for a $1 million personal money judgment against Grose.

On appeal, Grose renews his claim that the district court reversibly erred by not asking—before the jury began deliberations— hether Grose wanted the jury to determine forfeiture. He also raises a new argument, asserting there were no "proceeds" to forfeit because he did not "obtain directly or indirectly any money or other property to forfeit." (Appellant's Br. at 54-55.)

*Standard of Review*

As an initial matter, the parties disagree on the standard of review. The government argues we must apply plain error review because Grose did not object or raise the jury issue prior to the jury's release. Grose counters that our review should be de novo because it was the court's obligation to ask whether he wanted a jury to consider the issue.[11] Grose is incorrect.

---

[11] Grose cites to only one federal case from the Ninth Circuit which declined to apply a plain error standard in the absence of a contemporaneous objection when the omitted action was the court's responsibility. In *United States v. Erskine*, the defendant claimed that he was not given adequate advice from the court on his request for self-representation. 355 F.3d 1161 (9th Cir. 2004). Although the defendant did not object at the time the advice was given, the appellate court declined to apply a plain error standard, reasoning:

> [W]e do not expect pro se defendants to know the perils of self-representation, and consequently, we cannot expect defendants to recognize

- 33 -

The court's obligation to perform a task does not, alone, excuse an attorney from making a proper objection when the court fails in its performance. *See United States v. Vonn*, 535 U.S. 55, 73 (2002) ("[T]he plain-error rule . . . requires defense counsel to be on his toes" even though the judge must act as well, "and the defendant who just sits there when a mistake can be fixed cannot . . . [complain] later on."); *United States v. Rausch*, 638 F.3d 1296, 1300 n.1 (10th Cir. 2011) ("[A] defendant who fails to object to the district court's procedures regarding the right of allocution must demonstrate plain error to warrant reversal on appeal." (Rule 32.1)); *United States v. Cook*, 550 F.3d 1292, 1297-98 (10th Cir. 2008) (applying plain error to Rule 32(i)(3)(B) violation).

However, because we conclude that the district court did not commit error –plain or otherwise – in its imposition of the forfeiture order,we do not need to decide whether plain error review applies.

*Rule 32.2 of the Federal Rules of Criminal Procedure*

Criminal forfeiture proceedings are governed by Rule 32.2 of the Federal Rules of Criminal Procedure. Rule 32.2(b)(1)(A) provides:

> As soon as practical after a verdict or finding of guilty, or after a plea of guilty or nolo contendere is accepted, on any count in an indictment or information regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute. If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus

that they have not been correctly and fully advised, let alone to point out the court's errors. Accordingly, plain error review would be inappropriate . . . .

*Id*. at 1166. This case is inapposite to the facts before us. Grose was at all times represented by able counsel.

between the property and the offense. If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay.

Section (b)(5) states:

(A) Retaining the Jury. In any case tried before a jury, if the indictment or information states that the government is seeking forfeiture, *the court must determine before the jury begins deliberating whether either party requests that the jury be retained to determine the forfeitability of specific property* if it returns a guilty verdict.

**(B) Special Verdict Form.** If a party timely requests to have the jury determine forfeiture, the government must submit a proposed Special Verdict Form listing each property subject to forfeiture and asking the jury to determine whether the government has established the requisite nexus between the property and the offense committed by the defendant.

(Emphasis added.)  This version of Rule 32.2 went into effect on December 1, 2009, approximately three months before Grose's trial began.  Prior to that time, the obligation was on a party to request the jury consider forfeiture.

Rule 32.2 distinguishes the procedures required for a personal money judgment from those required for forfeiture of specific property.  *United States v. Newman*, 659 F.3d 1235, 1242 (9th Cir. 2011) (citation omitted).  Rule 32.2(b)(1)(A) provides the government's request for a *personal money judgment,* authorizes the *court* to "determine the amount of money that the defendant will be ordered to pay." (Emphasis added).  Only if the government seeks forfeiture of *specific property* does Rule 32.2(b)(5) come into play.  At that point, the jury may determine forfeitability with a special verdict.  Grose argues that Rule 32.2(b)(5) should be read to apply to personal money judgments as well, but we find no grounding in the language of the statute to support this contention.  *See United States v. Gregoire*, 638 F.3d 962, 972 (8th Cir. 2011) (Rule 32.2(b)(5)(A) "by its

plain language applies only to the forfeitability of specific property.") (quotations omitted).  The government did not seek forfeiture of any *specific* property in the indictment.  The district court was not required to determine if Grose wanted a special verdict.

*Proceeds*

In *United States v. McGinty*, we stated "the district court must order forfeiture of any and all proceeds of the offense and any property derived from those proceeds" under 18 U.S.C. § 982(a)(2).  610 F.3d 1242, 1246 (10th Cir. 2010).  Grose argues *McGinty* "indicates that there were no proceeds [in this case] because there was no profit to be disgorged."  (Appellant's Reply Br. at 29.)  This argument is wholly without merit.

Grose acknowledges 18 U.S.C. § 981 defines "proceeds" as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense."  Incredibly, he nonetheless claims he received no "gain" from his theft of $1 million from Quest, apparently because the company he invested in went bankrupt.  (Appellant's Br. at 55.)  Grose fails to recognize he was convicted of stealing $1 million.  Merely because he used the money to make a bad investment did not cause the funds to evaporate.  As has been succinctly said by other courts, "Congress sought to punish equally the thief who carefully saves his stolen loot and the thief who spends the loot on wine, women, and song."  *Newman*, 659 F.3d at 1243 (quotations omitted).  Grose's decision to place his gains in an ill-advised investment does not excuse him from the forfeiture of $1 million.  "The government is entitled to a money judgment against

- 36 -

[Grose] for the money he obtained from his criminal activity." *McGinty*, 610 F.3d at 1246.

## IV.    CONCLUSION

The jury instructions clearly and adequately informed the jury of its obligations. There was no plain error in the district court's discretionary determinations regarding the prosecutor's questions to Grose's character witness and Grose's sentence was imposed correctly in all respects, including the district court's order of forfeiture. AFFIRMED.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge